OTTAWA BOTTLE & FLINT-GLASS CO. *v.* GUNTHER and others.

(*Circuit Court, E. D. Wisconsin.* May, 1887.)

1. IMPLIED WARRANTY — "EXPORT-BEER BOTTLES"—EVIDENCE OF MEANING IN THE TRADE.
   Evidence is admissible, in an action for breach of contract, to show what was meant in the trade by "export-beer bottles," (which were the subject of the contract,) in order to determine whether there was an implied warranty, in the term "export," that such bottles could be subjected to the steaming process without breaking, after being filled, in order to destroy the germs of fermentation in the beer.

2. SAME—LANGUAGE OF CONTRACT.
   In such case there is no implied warranty that the bottles will be fit for the use intended by the purchaser, whether known to the manufacturer or not, unless such warranty arises from the language employed in the contract.

3. ESTOPPEL—BREACH OF CONTRACT—CONDUCT OF DEFENDANT.
    In such case, the fact that defendants paid for part of the bottles received under the contract, and subsequently ordered and received more under the same contract, and entered a charge for breakage upon their books in a negotiation for settlement, does not estop the defendants from setting up a breach of contract by the plaintiff.

The parties to this suit, in 1881, entered into a contract in writing by which the plaintiff, a manufacturer of bottles at Ottawa, Illinois, agreed to make and furnish to the defendants, a firm then engaged in the business of bottling beer in Milwaukee, 6,000 gross of bottles, known as "quart export-beer bottles," to be delivered free on board cars at Ottawa, between December 1, 1881, and September 1, 1882; and to be shipped at the mutual convenience of the parties. The defendants were to pay for the bottles six dollars per gross, net, and, at their option, were to make payment by note at 60 days from date of each consignment, or in cash, deducting in that case 2 per cent. from the gross amount of such consignment. The plaintiff manufactured all the bottles, and was in readiness to deliver them by June 30, 1882. In performance of the contract, the plaintiff shipped to the defendants large quantities of the bottles; but in December, 1882, shipments ceased, and none were afterwards made in consequence of the refusal of the defendants to give further orders for bottles; thus leaving a large quantity undelivered, and on the hands of the plaintiff. The defendants used all the bottles they received from the plaintiff. Upon the failure of the defendants to order shipments of the remaining undelivered bottles, the plaintiff, after notice duly given, made resales of them to other parties, realizing therefor a sum much less than it would have realized for them under the contract, if the defendants had accepted and received them.

The plaintiff brought this suit to recover damages for breach of the contract by the defendants, claiming that its damages consisted of losses on account of the bottles which the defendants refused to receive, and which were resold to other parties. The defendants, by their answer and counter-claim, alleged that the bottles which were delivered to them under the contract were to a large extent not such bottles as the contract required the plaintiff to furnish; that they were not suitable and fit for the purpose for which they were intended; and that, in consequence, the defendants, in the attempted use of them, sustained loss and damage which they sought to recover from the plaintiff. In support of their claim, the defendants sought to show that the bottles were contracted for with knowledge on the part of the plaintiff that in their use as export-beer bottles they must be subjected, after being filled with beer, to what is known as the steaming process, which is a process by means of which the bottles, with their contents, are heated to a certain degree before being put upon the market, for the purpose of destroying the germ of fermentation in the beer. The contention of the defendants was that there was an implied warranty on the part of the plaintiff that the bottles should be of such quality as to withstand this process of heating by the application of steam, and it was stated to the court that the defendants would show that, in applying this process, a very large proportion

of the bottles were broken, by means of which the defendants sustained large damages in the loss of bottles, beer, and other materials.

*W. J. Turner* and *Hiram T. Gilbert*, attorneys for the plaintiff, objected to the introduction of any evidence to show the use to which the defendant intended to put the bottles when the contract was made, or that the plaintiff had knowledge of such contemplated use, and to any evidence of breakage of bottles in applying the steaming process. They contended that this was a contract for a known, described, and defined article, namely, "export-beer bottles,"—the word "export" being merely descriptive of the articles to be furnished; and that "where a known, described, and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the known, described, and defined thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer." 2 Benj. Sales, § 987. They cited, also, 1 Pars. Cont. 586, 587, where it is said:

"If a thing be ordered of the manufacturer for a special purpose, and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. This principle must, however, be limited to cases where a thing is ordered for a special purpose, and not applied to those where a special thing is ordered, although this be intended for a special purpose."

It was further argued by counsel that as the contract in suit was in writing, and did not contain any express warranty, no warranty, express or implied, could be added to or engrafted upon it.

*F. Scheiber* and *H. C. Sloan*, for defendants, contended that the principles of law invoked on the part of the plaintiff were not applicable; that this was a case where there was an implied warranty that the articles contracted for, should be reasonably fit for the purposes for which they were ordinarily used, or should be fit for the special purpose intended by the dealer, if that purpose was communicated to the manufacturer when the contract was made. Further, they argued that the effect of the defendants' proposed testimony would not be to enlarge or change the contract by adding thereto a warranty not expressed therein, but that they sought to establish such an implied warranty as might be raised from the language employed in the contract itself, and that this involved an inquiry into what is meant in the trade by the term "export-beer bottles."

DYER, J., ruled at the trial, upon the question involved, as follows:

It is an elementary principle of law that where a known, described, and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the known, defined, and described thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. Where a manufacturer or a dealer contracts to supply an article which he manufactures or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is in that case an im-

plied term of warranty that it shall be reasonably fit for the purpose to which it is to be applied. In such a case the buyer trusts to the manufacturer or dealer, and relies upon his judgment, and not upon his own. Benj. Sales, §§ 987, 988, and authorities cited in the notes. It is also the law that where the contract of sale is in writing, and contains no warranty, parol evidence is not admissible to add a warranty. *Van Ostrand* v. *Reed*, 1 Wend. 424; *Reed* v. *Wood*, 9 Vt. 285; *Mumford* v. *McPherson*, 1 Johns. 414; *Wilson* v. *Marsh*, Id. 503; *Lamb* v. *Crafts*, 12 Metc. 353; *Dean* v. *Mason*, 4 Conn. 432; *Randall* v. *Rhodes*, 1 Curt. 90.

In *Whitmore* v. *South Boston Iron Co.*, 2 Allen, 52, the contract between the parties was, that the defendant should make 18 or 22 retorts in dry sand, with two heads each, weighing about 3,000 pounds each, for $100 each. It was proved on the trial that the retorts were ordered for use in the manufacture of coal-oil, and the judge of the trial court instructed the jury, among other things, that, "in all cases where a person orders of a manufacturer an article to be made for a special purpose, and relies upon the judgment of the manufacturer alone, there is an implied warranty that the article shall be reasonably fit for the purpose for which it is to be used; and, if they found the present case to come within this principle, it was the same as if the parties had put the implied warranty in writing, and had expressly warranted to furnish such retorts as should be fit for the purpose for which they were ordered; that it was not necessary for the defendants to know the entire object for which they were to be used, but only so much as was material for their purposes, and not the whole art of making coal-oil; that it was for the jury to say whether the defendants did not know enough upon the evidence to require them to make retorts fit and proper for that use and purpose; and that it was not necessary for the plaintiffs to inform the defendants of the purpose for which the retorts were to be used, but it would be sufficient if the defendants knew it." It was held by the supreme court that these instructions were erroneous. In the opinion it was said that "the contract did not imply that the retorts should be fit for the particular use alleged in the declaration. It is only when a party undertakes to supply an article for a particular use that he is held to warrant that it shall be fit and proper for that purpose. Chit. Cont. 450, and cases there cited; *Brown* v. *Edgington*, 2 Man. & G. 279; *Dutton* v. *Gerrish*, 9 Cush. 89. When the contract is in writing, an additional warranty, not expressed or implied by its terms, that the article is fit for a particular use, cannot be added either by implication of law or by parol proof. *Chanter* v. *Hopkins*, 4 Mees. & W. 399. The general doctrine that parol evidence is inadmissible to vary or add to a written contract would exclude the parol proof; and the ordinary doctrine of construing contracts, by adopting the fair import of the language which the parties have used, would exclude such warranty by implication of law."

In *Chanter* v. *Hopkins*, 4 Mees. & W. 399, which is a leading case upon this subject, the defendant sent to the plaintiff, the patentee of an invention known as "Chanter's Smoke-Consuming Furnace," the following written order: "Send me your patent hopper and apparatus, to fit

up my brewing copper with your smoke-consuming furnace." The plaintiff accordingly put up on the defendant's premises one of his patent furnaces, but it was found not to be of any use for the purposes of a brewery, and was returned to the plaintiff. The question was whether there was an implied warranty on the part of the plaintiff that the furnace supplied should be fit for the purpose of a brewery. The principle before cited from Benjamin on Sales, § 987, was here applied, namely, that the purchase was of a defined and well-known machine. PARKE, B., said:

"The plaintiff has performed his part of the contract by sending that machine; and it is the defendant's concern whether it answers the purpose for which he wanted to use it or not. As I read the contract, all the plaintiff has to do is to send his patent machine, and whether it answers the purpose of the defendant or not, with that the plaintiff has nothing to do. He has furnished the machine contracted for, and he is entitled on that contract to recover the stipulated price."

It was further observed by the court that the defendant could not be allowed to give parol evidence as to any warranty not contained in the agreement itself, and that the question was therefore reduced to the construction of the words of the agreement as contained in the order.

The rule to be deduced from all the authorities on the subject, is that, where a contract for the purchase or manufacture of specific articles, or of a certain class of articles, is in writing, and contains no express warranty of fitness of the article for a certain intended use, an implied warranty does not exist unless it can be made to arise from the contract itself. It must have its source, if at all, in some language, either of description or other character, employed in the contract. Now, if this were a contract for the manufacture and sale of bottles, if that was the only description of the article contained in the contract, then, within the authority of the cases that have been referred to, there would be no implied warranty that the bottles furnished, should be of such quality as to stand the process of heating by steam after being filled with the contents which they were intended to hold. If such were the contract here, so far as a description of the property is concerned, then the case would be upon principle like that of the contract for the retorts in the case in 2 Allen, and like that of the order for the furnace in the case in 4 Mees. & W. Then the contract would be one for the manufacture of defined and well-known articles, namely, bottles, and parol evidence could not be given to establish any warranty of quality not contained in the written contract itself. But the terms used in the contract in suit are "export-beer bottles," or 6,000 gross of bottles known as "quart export-beer bottles." The word "export," as thus used, is a word of description, and describes the bottles which the plaintiff was to manufacture for and furnish to the defendant. Now, the question is whether any implied warranty of quality may arise from the descriptive terms thus used in the contract.

In *Morehouse* v. *Comstock*, 42 Wis. 626, there was a contract in writing for the purchase of "Michigan apples." The contract contained no express warranty. The court, however, held that there was an implied

warranty that the apples "were conformable as to kinds, condition, and quality to that which would be understood by the trade, from the term 'Michigan apples,' *these being the descriptive words of the contract.*" The principle thus applied in that case, is applicable to the contract here. The bottles to be manufactured and furnished, being described as "export-beer bottles," although there are no words of warranty whatever in the contract, there was an implied warranty that the bottles furnished should be conformable, as to kind, condition, and quality, to that which would be understood by the trade from the term "export-beer bottles." This does not add to the contract a warranty wholly outside of the contract, but simply gives effect to what may be implied from the language used in the contract, descriptive of the property which the plaintiff was to manufacture and furnish to the defendants. The court will therefore allow testimony to be given showing, what, in construction and quality, export-beer bottles in fact were, according to the common understanding of the trade on that subject.

On the trial, testimony was given, on the part of the defendants, tending to show that, according to the general understanding and usage of the trade, export-beer bottles, when produced by the manufacturer, were expected to be of such quality as would make them sufficient to withstand a certain degree of steam heating after being filled with beer, to make them suitable for use as such bottles, and that the bottles received under the contract in suit were not of such quality. At the conclusion of the evidence, the court instructed the jury upon the subject of implied warranty, and the liability of the plaintiff to the defendants on account of breakage of bottles, as follows:

"Under the contract in question, it became the duty of the plaintiff to furnish to the defendants what were known in the trade as 'quart export-beer bottles,' that is, beer bottles which should conform as to kind and quality to what would be understood by the trade from the term 'export-beer bottles,' the word 'export' being descriptive of the bottles to be supplied and furnished.

"The first question to determine is, whether the bottles which were actually delivered to the defendants, and received by them under the contract, met the requirements of the implied warranty that the bottles should be in kind and quality 'export-beer bottles,' as understood generally in the trade. You have learned from the testimony the uses to which such bottles are put in the business of bottling beer. Now, it is said by the defendants that, when purchases are made or orders given by dealers for export-beer bottles, it is understood and implied in the trade, among other things, that the bottles shall be of such construction and quality as to stand, without a greater proportion of breakage than two per cent., the process of heating by steam after being filled with beer. This is a controverted question of fact between the parties. The point, you will notice, is not whether these bottles were sufficient for any particular use to which the defendants might put them, or would withstand any particular process of heating which the defendants might apply to them, but whether, in the first place, in the common understanding of the trade, export-beer bottles were expected to be such as must be subjected to a process of heating by steam to a certain degree, or within certain degrees, after being filled with beer; and, if so, then, *secondly,* did the defendants apply the process in such a manner, and only to such a degree, as

conformed to the understanding of the trade? and, if they did, then, *thirdly,* was there such an excessive breakage of the bottles as constituted a breach of the implied warranty which the court has defined?

"The plaintiff did not warrant or guaranty that none of these bottles would break in the process of steaming. Its undertaking was that it would manufacture export-beer bottles in the usual way, and with the usual materials and skill required to make what the general trade would recognize as export-beer bottles, suitable for use as such in the trade; and if, in applying the steaming process according to the usual and proper and reasonably safe methods, there was an excessive breakage of bottles, that fact would simply be evidence to show that they were not properly manufactured. * * *

"So, upon this branch of the case, you will determine, first, whether it was understood in the trade, when this contract was made, that export-beer bottles were such as must be sufficient in quality to withstand a certain process of steam heating after being filled with beer, to make them export-beer bottles, suitable for use as such. If this was the common understanding of the trade at the time, then there was an implied warranty that the bottles would be so manufactured, and of such quality, as to meet the requirements of the trade. If such understanding did not then prevail in the trade, then there was no implied warranty that the plaintiff was to furnish bottles of that quality.

"If you should find from the evidence that such an implied warranty as I have stated, did arise upon the contract which the parties made, then you will determine whether the defendants applied to the bottles the process of heating in such a manner, and only to such a degree, as conformed to the understanding and usage of the trade. The plaintiff should not be charged with any breakage or loss of bottles resulting from carelessness or unskillfulness of the defendants, if there was any, in applying the steaming process. The testimony tends to show that there was a minimum and a maximum degree of heat that might be applied in the process of steaming, within the limits of trade usage. The defendants were required to keep within such limits in this respect as the testimony may show the trade recognized as necessary, proper, and safe; and if they exceeded those limits, thereby producing excessive heat, and causing the bottles to break, the plaintiff ought not to be made liable for losses so occasioned. * * * The testimony tends to show that the trade recognizes a breakage of two per cent. as liable to occur with all bottles in the process of heating, and as not chargeable to the manufacturer. The defendants do not insist that the plaintiff is liable to them for more than the alleged excess of breakage over two per cent., and it is upon that basis that you may make your estimates if you conclude that the defendants' claim on account of breakage of bottles is established. * * *

"You will bear in mind that if you should find that there was no common understanding prevailing in the trade when this contract was made, that 'export-beer bottles' were expected, for the purpose of their ordinary use, to be subjected to this steaming process after being filled with beer, then there was no implied warranty that these bottles should be of a quality to stand such process; and in that case the defendants would not be entitled to any allowance on their counter-claim, or for losses on account of breakage. But if the usage and understanding of the trade in that respect were as claimed by the defendants, then such implied warranty did arise, and the plaintiff would then be liable for such consequences of a breach thereof, if there was a breach, as I have pointed out, within the limits stated. If a liability on the part of the plaintiff for breakage of bottles is established, it would include the value, not only of the bottles, but of beer, corks, and wire actually lost in consequence of breakage. * * *

"If you find such a state of facts proven as, within the instructions I have given, created an implied warranty on the part of the plaintiff of the quality

of the bottles, and further find that there was a breach of such warranty, then the plaintiff can recover nothing on account of the bottles which remained undelivered. That is to say, if, in furnishing export-beer bottles under the contract, you should find that, according to the common understanding of the trade, the plaintiff was bound to supply bottles that, for the purposes of use, must withstand to a certain extent the process of heating by steam, and that such bottles were not supplied, and, consequently, that the contract was broken by the plaintiff, then I am of the opinion that the plaintiff is without remedy, so far as the undelivered bottles are concerned. This would be so, because the contract was single and entire, and all of the bottles confessedly were of one and the same manufacture; and, if the bottles delivered were as defective in quality as claimed by the defendants, the unrebutted presumption would be that those undelivered were equally defective.  *  *  *

"It is conceded that, after some of the breakages of bottles—now claimed to have been very serious—occurred, the defendants ordered other bottles under the contract, and accepted the same, and made payments on the bottles received, to the extent of over $24,000. It is claimed by the plaintiff that, when the parties negotiated in relation to a settlement, the defendants were willing to accept two per cent. on account of breakage, and entered a charge upon their book accordingly, of that amount, as their claim for breakage. It has been insisted by plaintiff's counsel, that these various acts of the defendants should be held to operate as an estoppel against their right now to complain of any breach of contract by the plaintiff.

"I do not think I can properly instruct you that, as matter of law, those acts constituted such estoppel, so as to absolutely preclude the defendants from asserting their present claim against the plaintiff. But it is your province, and indeed duty, to consider what effect should be given to the acts of the defendants in continuing to order shipments of bottles, accepting and using them, and paying therefor, as bearing upon the question of the probable extent to which the bottles broke when used. The plaintiff's contention is, that if such losses from breakage were occurring as is now claimed, the defendants would not have kept on ordering shipments and making payments, but that their complaints on that score would have been more serious; that they would have sooner stopped payments, and refused to order more shipments; and that their present claim is inconsistent with their course of action at the time. This consideration, urged in argument, should have your serious attention, and such weight should be given it as you think it, in view of all the circumstances, entitled to. On the other hand, the defendants, in explanation, say that they were really making trials of the bottles; that they were, from time to time, insisting upon and expecting shipments of a better quality of bottles in response to their orders; and that, under these circumstances, and with these expectations, they consented to receive, and paid for, various shipments of bottles that were made, relying upon a faithful performance of the contract by the plaintiff. To this explanation, and these suggestions, you will give also such weight as you think them entitled to; and, as you weigh the claims made on both sides, deal with and dispose of them as the weight of credible testimony and your sense of justice may prompt."