J. B. EHRSAM *et al.*, *as Partners, etc.*, V. CORDELIA BROWN, *as Administratrix, etc., et al.*.

No. 14,901. (91 Pac. 179.)

SYLLABUS BY THE COURT.

1. SALES—*Implied Warranty as to Fitness.* Where a known, described and specified article is sold by a dealer under a contract to be executed by delivery of the specified article, which is actually supplied to the buyer, there is no implied warranty that it shall answer the particular purpose intended by the buyer, although such purpose is communicated to the dealer beforehand.

2. ———— *Implied Warranty against Latent Defects.* Where a dealer contracts to deliver to a purchaser at an agreed price a known, described and specified article, manufactured generally for the trade, there is no implied warranty against latent defects of which the dealer has no knowledge.

3. ———— *Machinery—Warranty.* The defendant, owner of a flouring-mill, gave a written order to plaintiffs for the purchase at an agreed price of certain machines for use in his mill, described and known as "Wolf gyrators," which order was accepted in writing, and the machines were shipped direct from the manufacturers to defendant. Plaintiffs were not manufacturers of the machines, but dealers. They knew the particular purpose for which the machines were ordered, but had no opportunity to inspect them until after delivery, and had no knowledge of latent defects. *Held,* that there

was no implied warranty that the machines would answer the particular purpose for which they were purchased, and no implied warranty against latent defects in their construction.

Error from Logan district court; JAMES H. REEDER, judge. Opinion filed July 5, 1907. Reversed.

*Hurd & Hurd,* for plaintiffs in error.
*W. E. Saum,* for defendants in error.

The opinion of the court was delivered by

PORTER, J.: By a contract in writing Casper Brown purchased from J. B. Ehrsam & Sons, for use in his flouring-mill, two Wolf gyrators. The gyrators were shipped direct from Wolf Brothers, the manufacturers, at Chambersburg, Pa., to Brown at Oakley, Kan. He received them, paid the freight charges from St. Louis to Oakley, and set them up in his flouring-mill. A controversy arose over the quality of the machines and he refused to pay the balance of the purchase-price. The contract provided that the title to the machines should remain in the vendors until the purchase-money was paid, and Ehrsam & Sons, having filed a mechanic's lien upon the mill property, brought this suit against Casper Brown to foreclose the lien. Defendant filed his answer and cross-petition, alleging that the gyrators were purchased upon an express warranty, as follows:

"That at the time of making said order, and in consideration of the promises and agreements on the part of this defendant, and as a further inducement for placing said order with plaintiffs, said plaintiffs promised and agreed with defendant that said machines would be constructed of good material, of first-class workmanship, supplied with necessary and suitable fixtures, and in all respects suited for the work intended."

He alleged a breach of this warranty, and asked damages resulting therefrom. On the trial the jury

found that an express warranty had been made, awarded damages caused by unseasoned materials used in the construction of the machines, and gave a small judgment for plaintiffs. Proceedings in error in this court followed, with the result that the judgment was reversed and the cause remanded for a new trial. (*Ehrsam v. Brown,* 64 Kan. 466, 67 Pac. 529.)

The contract of purchase, which consisted of the written order and the letter of acceptance, is set out in full in the former opinion and need not be recited here. The former judgment was reversed for error in admitting parol evidence to show an express warranty, the contract being in writing and on its face complete.

After the case was remanded to the district court defendant filed an amended answer and counter-claim, and set up an implied instead of an express warranty. A second trial was had on the amended pleadings, in April, 1902, in which the jury returned a verdict in favor of defendant for the sum of $43.50, and made special findings. On motion of plaintiffs the verdict and findings were set aside, a new trial ordered, and the cause continued. Thereafter the defendant, Casper Brown, died, and the action was revived against his administratrix and heirs at law, who are defendants in error herein. At the April, 1905, term of the district court the cause was submitted to the court on a stipulation providing in substance that the court should determine which party was entitled to judgment upon the pleadings, the evidence introduced upon the second trial, and the special findings and verdict of the jury, reserving to each party the benefit of all objections and exceptions made during the progress of the cause. The findings of the jury referred to in the stipulation were numbered from 1 to 54, among which were the following:

"(1) Ques. Did the plaintiffs contract and agree with Casper Brown to furnish him two gyrators for use in his mill at Oakley, Kan.? Ans. Yes.

"(2) Q. Did plaintiffs, at the time of making such sale, know that the machines were to be used for a special purpose in and about defendant's mill? A. Yes.

"(3) Q. Did plaintiffs, or their representatives, at the time of making said sale or taking the order from the defendant, examine the mill property of the defendant and know what would be required in the way of changes in and about said mill in order to install said gyrators in said mill? A. Yes.

"(4) Q. Did the said defendant, Casper Brown, have an opportunity to inspect said machines at the time of giving his order therefor? A. No.

"(5) Q. Did the defendant, Brown, rely on the representations of the plaintiffs as to the character and quality of said machines and their fitness for use in his mill? A. Yes.

"(6) Q. Were the plaintiffs familiar with the construction and character of the machine described as Wolf gyrators, which they sold to the defendant? A. Yes.

"(7) Q. Were the machines ordered by the defendant from the plaintiffs constructed of good material, of good workmanship, and well suited for the purpose intended? A. No.

"(8) Q. If you answer the last question 'No,' state what the defects were. A. Defects caused by unseasoned lumber.

"(9) Q. What was the actual value of the machines? A. $375.

"(10) Q. How much do you allow the defendant as general damages on account of plaintiffs' failure to furnish the defendant with perfect machines? A. $500."

"(15) Q. How much damage do you allow the defendant on account of loss of profits on the usual product of his mill? A. $200."

"(19) Q. How much damage do you allow defendant for the injury to the grade of the flour referred to? A. $76."

"(30) Q. Did the plaintiffs manufacture said gyrators? A. They did not."

"(32) Q. Did the plaintiffs, or either of them, see said gyrators before they were delivered to the defendant? A. No.

"(33) Q. Where were said gyrators manufactured? A. Chambersburg, Pa.

"(34) Q. Where was the plaintiffs' place of business at the time of the sale and delivery of said gyrators? A. Enterprise, Kan.

"(35) Q. When the gyrators were delivered to the defendant, did he examine them for the purpose of ascertaining the quality of material of which they were constructed? A. No."

"(37) Q. How much, if anything, do you allow the defendant for damage resulting directly or proximately from the use of unseasoned lumber in the manufacture of said gyrators? A. $893.50."

"(42) Q. When gyrators like those in controversy were put upon the market by the manufacturers, were they intended to be a complete machine ready to be attached, by proper connections, and made a part of a flouring-mill? A. Yes.

"(43) Q. Leaving out all considerations of the quality of the machines, were said gyrators otherwise properly planned and constructed for the purposes for which they were sold? A. Yes."

"(50) Q. At the time the plaintiffs sold the gyrators to the defendant, or at any time before the defendant commenced using said gyrators, did the plaintiffs, or either of them, know that said gyrators were made of green or unseasoned lumber? A. No."

"(53) Q. Were said gyrators of the kind ordered by the defendant of the plaintiffs? A. No.

"(54) Q. If you answer 'No' to the last question, state in what respect and wherein said gyrators failed to be of the kind ordered by the defendant from the plaintiffs. A. Because they were not perfect machines on account of being constructed of unseasoned lumber, rendering them unfit to perform the work perfectly, for which they were put in the mill."

Plaintiffs moved for judgment on the special findings. The court took the case under advisement and at a subsequent term gave judgment for defendants in error against plaintiffs for the sum of $43.50, in accordance with the verdict and findings. Plaintiffs bring the case here for review, and allege numerous errors. Many of these relate to rulings upon objec-

tions to the amended cross-petition, filed after the cause was remanded, and to objections to the evidence introduced by defendant in support of the cross-demand. From the view we have taken of the case its merits can be disposed of by considering the action of the trial court upon the motion for judgment on the findings.

It might be observed in passing to the main question that the jury beyond doubt allowed several items of alleged damages twice; and it is equally clear that their finding the value of the machines to be $375, in the face of the express terms of the written contract fixing the purchase-price at $875, was without warrant of law. It is well settled that a purchaser of goods who seeks to recover damages for a breach of a warranty must affirm the contract in all its terms, and is bound by the contract price. He cannot retain the goods and at the same time repudiate the contract. (*Weybrich & Co. v. Harris*, 31 Kan. 90, 1 Pac. 271.) Plaintiffs were entitled to a credit, to start with, of the $875, the price and value fixed by the contract, from which should be deducted the freight charges of $25 paid by defendant, and any damages resulting from a breach of any warranty which the contract expressed or the law implied. That there was no express warranty was settled by the former decision. The main question, therefore, is this: From the facts in this case was there an implied warranty by plaintiffs that the machines would do the work for which they were purchased? The doctrine of implied warranties in the sale of manufactured articles was stated and applied in *Lukens v. Freiund*, 27 Kan. 664, 51 Am. Rep. 429. The syllabus reads as follows:

"While when an article is ordered from a manufacturer to be by him manufactured for a specific and understood purpose there is in some cases an implied warranty that the article when manufactured will be reasonably fit for the purpose intended, yet when a purchase is made from him of a specific and completed article he is to be regarded as a dealer and his liabil-

ity determined accordingly." (See, also, *Field v. Kinnear*, 4 Kan. 476; *Bigger v. Bovard*, 20 Kan. 204; *Duncan v. Baker*, 21 Kan. 99.)

Mr. Justice Brewer in the opinion quotes in the following language from a well-recognized authority:

"After quite a review of the authorities in Smith's Leading Cases, p. 251, the author sums up the result thus: 'On the whole, therefore, it may be doubted whether there be any instance in which a knowledge of the object for which a specific chattel is bought will raise an implied warranty that it is fit for that purpose, although a failure to acquaint the vendee with its unfitness may be evidence of fraud, and thus render the vendor liable in action of tort.'" (Page 667.)

The same question was passed upon by this court in *Safe and Lock Co. v. Huston*, 55 Kan. 104, 39 Pac. 1035. It was there held that there was no implied warranty as to quality. The court said:

"There is nothing in this case indicating that the safe purchased by the plaintiffs was manufactured specially for them, but the fair inference is that it was one of a kind of safes which the defendant manufactured for sale to whomsoever would buy." (Page 107.)

The doctrine of *Lukens v. Freiund*, 27 Kan. 664, 51 Am. Rep. 429, was expressly approved in *Kinkel v. Winne*, 67 Kan. 100, 72 Pac. 548, 62 L. R. A. 596, where the contract was for the sale and purchase of a fire-insurance business and it was sought to establish an implied warranty of the character and fitness of a certain register showing the expiration of policies. In the opinion the following statement of the general rule was quoted from page 404 of the second edition of Leake on Contracts:

"If an order be given for the manufacture or supply of an article to satisfy a required purpose, *that purpose, and not any specific article, being the essential matter of the contract,* the seller is then bound, as a condition of the contract, to supply an article reasonably fit for the purpose, and is considered as warranting that it is so. If an order be given for a specific article

of a recognized kind or description, . . . and the article is supplied, there is no warranty that it will answer the purpose described or supposed, although intended and expected to do so." (Page 103.)

It is interesting in this connection to note that by statute in England no such warranty as is contended for in this case can arise by implication. The English sale of goods act upon this subject is as follows:

"14. Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract of sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a description which it is in the course of the seller's business to supply (whether he be the manufacturer or not), there is an implied condition that the goods shall be reasonably fit for such purpose, provided that in the case of a contract for the sale of a specified article under its patent or other trade name there is no implied condition as to its fitness for any particular purpose." (62 L. J., n. s., 276.)

The scope of this proviso is stated by Lord Chief Justice Russell in the following language:

"That obviously is intended to meet the case, not of the supply of what I may call for this purpose raw commodities or materials, but for the supply of manufactured articles—steam-plows, or any form of invention which has a known name, and is bought and sold under its known name, patented or otherwise." (*Gillespie Brothers & Co. v. Cheney, Eggar & Co.* (1896), 2 Q. B. 59, 64.)

The common-law rules on the subject of implied conditions or warranties as to quality or fitness are referred to and the cases classified in *Jones v. Just*, L. R. 3 Q. B. 197, 37 L. J. 89, where the particular warranty under consideration was spoken of in the following language:

"Thirdly, where a known, described and defined ar-

ticle is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the known, described and defined thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. *Chanter v. Hopkins*, 4 M. & W. 399." (Page 202.)

The English statute on this subject is discussed and the leading cases under the statute, which is declaratory of the common law, are cited at pages 622, 623 and 635 of the fifth edition of Benjamin on Sales.

In *Davis Calyx Drill Co. v. Mallory*, 137 Fed. 332, 69 C. C. A. 662, 69 L. R. A. 973, there was a written contract for the purchase of a drill described in the manufacturer's catalogue. The purchaser relied upon assurances made before the contract was entered into to the effect that the drill would be suitable for drilling through certain strata of rock in Lucas county, Iowa, and sought to recover damages upon the theory that because the manufacturer knew the special purpose for which the drill was purchased there was an implied warranty that it would be suitable for such purpose. It was held:

"An implied warranty that an article will be fit for a particular purpose may be inferred from a contract to make or furnish it to accomplish that specific purpose, because the accomplishment of the purpose is the essence of this contract.

"But no implied warranty of such fitness arises out of a contract to make or supply a described and definite article, although the vendor knows that the vendee is purchasing it to accomplish the specific purpose, because the essence of this contract is the delivery of the specific article, and not the accomplishment of the purpose." (Syllabus.)

So in *Seitz v. Brewers' Refrigerating Co.*, 141 U. S. 510, 2 Sup. Ct. 46, 35 L. Ed. 837, the manufacturer was informed that plaintiff desired to dispense with the use of ice in cooling his brewery; that unless the proposed machine would cool 150,000 cubic feet of air to a certain degree it would be of no value. The manufacturer assured him that the machine would answer

the purpose, and plaintiff entered into a written contract relying upon such representation. The contract was for the purchase of a certain, specific machine, which failed to answer the purpose for which it was purchased. The supreme court held that there was neither an express nor an implied warranty that the machine would answer the purpose.

As was said in *Davis Calyx Drill Co. v. Mallory*, 137 Fed. 332, 69 C. C. A. 662, 69 L. R. A. 973, "it is not the familiarity of the purchaser with the character and work of the machine ordered, but the identity of the thing described in the contract, which brings the latter within the rule" (p. 337) that there is no implied warranty of fitness where a known, definite and described thing is purchased.

A recent case in point is *Lombard Co. v. Paper Co.*, 101 Me. 114, 63 Atl. 555, 6 L. R. A., n. s., 180. There, as here, the written contract consisted of a proposal to purchase and an acceptance. The things purchased were automatic water-wheel governors, described as "four (4) of our type 'B' governors, and four (4) of our '23' balanced relief valves." It was contended that the governors were not adapted to the purpose intended, and that there was an implied warranty that they would be suitable for the purpose of defendant's plant. The court said in the opinion:

"It would be sufficient to say that the existence of this implied warranty as part of the contract is negatived by its explicit terms defining the guaranties of the plaintiff, by the fact that it contains express guaranties which by legal construction exclude all others, *and by the fact that the goods sold were articles such as the vendor in the ordinary course of his business manufactured for the general market.* When a contract is in writing, an additional warranty, not expressed or implied by its terms, that the article is fit for the particular use, cannot be added by implication." (Page 119.)

In addition to the foregoing, the following cases announce the same doctrine: *Shear Co. v. Carbon Co.*,

75 Ohio St. 153, 78 N. E. 1009; *Grand Avenue Hotel Co. v. Wharton,* 79 Fed. 43, 24 C. C. A. 441; *Storage Co. v. Woods & Zent,* 99 Mich. 269, 58 N. W. 320, 41 Am. St. Rep. 599; *Peoria Grape Sugar Co. v. Turney,* 175 Ill. 631, 51 N. E. 587; *Wiedeman v. Keller,* 171 Ill. 93, 49 N. E. 210; *Gossler v. Eagle Sugar Refinery,* 103 Mass. 331; *Milwaukee Boiler Co. v. Duncan,* 87 Wis. 120, 58 N. E. 232, 41 Am. St. Rep. 33; *Goulds v. Brophy,* 42 Minn. 109, 43 N. W. 834, 6 L. R. A. 392; *Wheaton Roller-mill Co. v. John T. Noye Mnfg. Co.,* 66 Minn. 156, 68 N. W. 854; *Whitmore & another v. The South Boston Iron Company,* 82 Mass. 52; *Ottawa Bottle & Flint-glass Co. v. Gunther,* 31 Fed. 208.

In volume 15 of the American and English Encyclopædia of Law, at page 1235, note 6, the case of *Smith v. McNair,* 19 Kan. 330, 27 Am. Rep. 117, is cited as holding generally that a dealer is liable to a purchaser of goods upon an implied warranty as to fitness and quality. There the vendor sold certain papers, purporting on their face to be genuine school-district bonds, which turned out to be forgeries. The vendor was held liable. The distinction between that case and this is that there the vendor did not deliver the thing purchased. In the opinion Mr. Chief Justice Horton stated the rule as follows:

"The rule is that if one person applies to another to purchase an article for a particular purpose, and the person so applied to sells him the article knowing that the purchaser relies upon his complying with his request, the law implies that the article is delivered with a warranty that it is the article called for." (Page 332.)

It will be readily seen that the case does not decide that there is an implied warranty on the part of the dealer that the thing sold will answer the purpose intended by the buyer, but that the implied warranty is that the thing called for by the contract of purchase shall be delivered.

Another case cited in the same note, where the ven-

dors were dealers and it was held that there was an implied contract as to quality, is that of *Shaw v. Smith,* 45 Kan. 334, 25 Pac. 886, 11 L. R. A. 681. Shaw & Co. were dealers in flaxseed, and Smith entered into a contract with them by which they were to furnish flaxseed for him to sow and raise a crop from. The dealers were to purchase the crop from him upon certain terms stated in the contract. The dealers did not have the flaxseed at the time the contract was made. They afterward furnished flaxseed which appeared to be good, and which both parties believed to be good. In fact it was worthless. It was held that there was an implied warranty that the seed should be sufficient for the purpose of sowing and raising a crop. It was said in the opinion:

"The entire contract when made was executory, and it was to be executed and performed afterward, and to be performed in parts and at different times. The seller was first to furnish the seed, and he did so in about ten days after the contract was made, and of course the seed was to be a kind of seed that would grow." (Page 338.)

This was necessarily implied from the fact that Smith was to sow it and raise a crop therefrom, which the vendors of the seed were to purchase upon certain terms and conditions mentioned in the contract. It will be observed that warranty of quality was one which the particular facts and circumstances of that case necessarily raised by implication. The vendors did not deliver the kind of seed necessarily contemplated by the parties when the contract was made. The contract was executory, and it is well settled that a different rule obtains where goods are sold and delivered upon an executed contract, as in the present case. (15 A. & E. Encycl. of L. 1239.)

In volume 2 of Mechem on Sales, section 1349, the author says:

"The implied warranty of fitness is not to be extended to cases which lack the necessary conditions

upon which it depends. The essence of the rule is that the contract is executory; that the particular article is not designated by the buyer; that only his need is known; that he does not undertake or is not able to determine what will best supply his need, and therefore necessarily leaves the seller to make the determination and take the risk; and, if these elements are wanting, the rule does not apply."

At the time the machinery in this case was purchased plaintiffs were engaged at Enterprise, Kan., in the business of manufacturing and selling mill machinery. The machines in controversy were not manufactured by them but were made by Wolf Brothers, at Chambersburg, Pa., and shipped direct to the purchaser from the manufacturers. Plaintiffs are dealers, and the findings are that they did not see the machines nor have an opportunity to do so until after they were in operation. There is a finding also that the machines turned out by the manufacturers and placed upon the market were complete in themselves and required only to be attached by suitable connections to be operated. It appears that the machines were described in the manufacturers' catalogue, and that thirty-two similar machines had been sold in Kansas and were in operation when Casper Brown, after corresponding with some of the owners of mills where such machines were in use, made his purchase.

The contract relied upon by plaintiffs appears to be the same contract in every respect that it was when the case was here before. It was then held that the written contract comprised in the order and letter of acceptance could not be varied or extended by parol evidence to cover matters upon which the writings themselves were silent. It was also said:

"Nothing remained to complete the contract save the delivery of the machines in accordance with its terms. The terms of the contract, the extent of the obligation undertaken by the parties, are embodied in and limited to what is expressed in the writing, and, as no words of warranty are employed, it will be con-

clusively presumed that no warranty was intended or existed." (*Ehrsam v. Brown,* 64 Kan. 467, 471.)

This language had reference to an attempt to prove an express warranty by evidence of an oral contemporaneous agreement. In the concluding paragraph of the opinion Mr. Justice Pollock, speaking for the court, observed that numerous cases had been cited upon the law applicable to implied warranties, and that they were inapplicable to the case of an express warranty, and further remarked:

"Had the defendant based his action for affirmative relief upon the existence of an implied warranty, and had the trial court submitted this theory of the case to the jury, the argument so made would have been applicable to such a case, but cannot be given weight here." (Page 473.)

After the case was remanded it was possibly assumed from the remark quoted that the same warranty could be established by parol evidence by merely amending the answer so as to call the warranty an implied instead of an express one. But nothing in the former opinion warrants the assumption. It appears, however, from the record that the testimony at the last trial differs but slightly from that introduced on the first trial. While defendant was not permitted in so many words to testify to an oral agreement as to quality and fitness, he was permitted to testify to conversations between plaintiffs and himself and representations to him by them with respect to the quality and fitness of the machines to do the work his mill required, and their advice and suggestions to him in reference to making changes in the mill to accomplish certain results, all of which occurred before the written contract was made. Thus, by parol evidence, much of which was the same as on the first trial, defendant was permitted to establish the identical defense which the former decision held could not be made, and extended by such proof the obligations of the contract to cover matters upon which the contract is silent. That

there is no such magic in words must be apparent. The case in this aspect presents many points of similarity to that of *Storage Co. v. Woods & Zent*, 99 Mich. 269, 58 N. W. 320, 41 Am. St. Rep. 599. The written contract in that case was for the sale and purchase of certain machinery for use in refrigeration, described as our "20 x 40 refrigerator." The action was to recover the contract price, and the defense was an express warranty that the apparatus would preserve fresh meats from thirty to fifty days, and that it failed to do so. The court instructed the jury that the written contract could not be varied by parol evidence and withdrew the defense of an express warranty, but gave an instruction that if they found from the evidence that defendants purchased the apparatus for a special purpose made known to plaintiff, and relied upon the judgment and knowledge of plaintiff and not on their own, then there was an implied warranty that the system furnished should be reasonably fit and suitable for that particular purpose. In the opinion the court said:

"The effect of these instructions, taken in connection with the first mentioned, was to permit the jury to find that there was no express warranty, but that there was an implied one, based on the very evidence relied on to show the express warranty; in effect holding that, while parol evidence was inadmissible to show an express warranty, it might be received to establish an implied one. Implied warranties are not unknown, and they are by no means limited to parol contracts. Thus, there is ordinarily an implied warranty of title where there is a contract of sale of personal property. Again: 'If a thing be ordered of the manufacturer for a special purpose, and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose.' This principle, however, is limited to cases where a thing is ordered for a special purpose, and cannot be applied to cases where a special thing is ordered, although it be intended for a special purpose. 1 Par. Cont. 587. . . . But it is a rule of general application that warranties, whether express or implied, can only issue from the contract itself; and

it must be a legal deduction, and cannot depend upon extrinsic evidence, except as it may be necessary for the explanation of some latent ambiguity. . . . In the present case the defendants contracted for the purchase, and erection in their refrigerator, of an apparatus patented by the plaintiff, and called the 'McCray Patent System of Refrigeration.' Beyond its name, there is nothing to show that it was anything in the nature of a refrigerating process. The contract does not show that it was designed to preserve meats, or that the defendants had anything to do with meats. It does not appear what use it was intended for, or that the plaintiff had any information upon the subject. No warranty can be implied from this that it would preserve meat for any particular length of time." (Pages 274, 275.)

In the case at bar the machines are described in the contract as "Wolf gyrators: 1 # 6-20 sieve 4 reduction machine. 1 # 6-30 sieve 6 reduction machine." It also appears that with the machines the manufacturers were to furnish sieves to change the granulation of flour from coarse to fine, and that the machines were to be installed in a flouring-mill. The contract is silent as to any special purpose for which they were purchased, and since the contract was for the sale of a specific, definite article, manufactured and supplied to the trade generally by the manufacturers, there was no implied warranty that it would answer to, or be suitable for, a particular purpose. The following language from *Johnson v. Powers*, 65 Cal. 179, 3 Pac. 625, was quoted with approval in *Rodgers v. Perrault*, 41 Kan. 385, 21 Pac. 287:

" 'If the contract between the vendor and vendee be reduced to writing, nothing which is not found in the writing (except that which is presumed by law from that which is written) can be considered as a part of the contract.' " (Page 386.)

But it is claimed that the defects which rendered the machines unsuitable were latent defects, caused by the use of unseasoned lumber in constructing them. The findings establish as facts that plaintiffs, who were

dealers and not the manufacturers, had no opportunity to see the machines until after they were delivered, and had no knowledge of the latent defects. There was no implied contract on the part of plaintiffs that the materials of which the machines were constructed should be sound.

"Where the vendor is not the manufacturer, and the purchaser knows this fact, the former is not responsible for latent defects in the absence of proof of an express warranty or of fraud and deceit upon the part of the seller." (15 A. & E. Encycl. of L. 1236.)

From these considerations it is apparent that upon the findings plaintiffs were entitled to judgment establishing and foreclosing their lien for the amount of the purchase-price of the machines, less the amount paid for freight. The cause is therefore reversed and remanded for further proceedings in accordance with these views.