No. 20,059.

PALM, FECHTELER & COMPANY, *Appellant,* v. THE UNCLE SAM OIL COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

SALE—*Shipment of Goods Different from Those Ordered—Special Findings—Contrary to General Verdict.* The jury returned a general verdict in favor of the plaintiff for certain articles ordered by and shipped to the defendant, but by their answers to special questions found that the sizes of such articles were not approved by the defendant and were different from those specified in the order, and the trial court set aside the general verdict and rendered judgment for the defendant on such answers. *Held,* proper.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed April 8, 1916. Affirmed.

*L. O. Carter,* and *Jacob S. Detwiler,* both of Kansas City, for the appellant.

*Albert L. Wilson,* and *Mark T. Wilson,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff recovered a verdict for $757.02 for 165,000 decalcomania name plates. In addition to the general verdict the jury returned answers to certain special questions. On motion of the defendant the verdict was set aside and judgment was entered in its favor on these answers. From this ruling the plaintiff appeals.

The essential facts of the case are that the plaintiff by its traveling salesman took an order of the defendant through its general sales manager for the name plates. The answer alleged that the order was taken on condition that the defendant could induce other oil companies to take a certain number of the articles, and the plaintiff's agent was notified not to transmit the order to the plaintiff but to hold the same until notified so to do by the defendant. The jury, however, not only found in favor of the plaintiff, but in answer to a special question whether the order was given with such understanding answered, No. It seems, however, that with the order was a list of dimensions indicating the sizes of the plates desired by the defendant, and that upon its receipt the plaintiff's artist, finding that such sizes would need to be somewhat different in order to be of proper proportions, the defendant was so advised, and in reply wrote, among other things—

"You understand if you manufacture these signs, you will have to hold them until such time as may come when we would be able to use them, as I instructed you not to go ahead with the order."

It is admitted in the answer that the plaintiff submitted to the defendant sketches of the name plates for approval, but it is averred that such approval was never given and that the defendant never authorized the plaintiff to make the plates it alleged it had manufactured for the defendant. After receipt of the letter last quoted from, the plaintiff wrote that the order

could be completed and shipped or the work stopped and the defendant be charged with the work already done plus profits, to which the defendant replied, reiterating that no authority had been given to manufacture the goods, and adding, "We can not entertain your proposition in your letter at all, and as soon as we need them, we will order them out."

Further correspondence repeated the claims of both parties, the defendant writing, among other things: "After giving you such positive instructions not to make shipment of this goods, we feel as though we are not under any obligations to your company."

The president of the plaintiff company testified, among other things, that the goods were in strict accordance with the order and the sketches submitted and approved. Also, that the designs were made up by the plaintiff's art department, "who figured the spaces and style of letter that would look best in the space where the transfers were to go, from the catalogue that was sent us with the order. . . . Where our customer specifies a definite size in his order, but tells us where he wants the transfer to go in a certain space—and we are to make up sketches for his approval, we consider the customer's dimensions only approximate, and draw up the sketches in a way that will look best in the given space. We then submit the sketches for his approval. If he approves of them, we make up the design accordingly, but if he does not, we make new designs. We make no changes in the transfers except those that have been first approved by the customer. When a transfer is finished and delivered, it is exactly the size that the customer has approved of." The artist testified that he considered the dimensions given as only approximate and did not follow exactly those given in the order. The plaintiff's sales agent testified without dispute that once when he called on the defendant's general sales manager the latter said that the submitted sketches were all right as far as he had seen them.

When the consignment was shipped it was refused by the defendant, and the defendant's general sales manager testified:

"It was refused because we could not use 165,000, and they had violated our instructions.

"Q. Yes, if you had been able to, you thought, to use 165,000 this

Palm & Co. v. Oil Co.

order would have been right, would it not, Mr. Winters?   A. Well, if they had been made according to our specifications.

"Q. They never were tried at all?   A. No, sir.

"Q. Did you ever examine them?   A. No, sir.

"Q. Do you know whether they could have been used or not?   A. I didn't examine them.

"Q. Then you don't know whether they could have been used or not? A. No, sir.

"Q. Do you say they weren't so they could have been used on your cans?   A. I don't know whether they can or not.   I don't know whether they will fit.

"Q. Then that wasn't the reason for refusing the order, was it?   A. It wasn't my reason, no.

"Q. What was your reason?   A. Because we couldn't use that many and they hadn't gone according to our instructions."

It will be seen from the foregoing that the sizes of the articles furnished were not precisely those specified in the catalogue accompanying the order, and that in the defendant's general sales agent's testimony this variance was mentioned as one of the reasons for refusing the payment.

The following answers were returned by the jury:

"7. Were the sketches of the articles to be manufactured made by plaintiff changing the size of the articles?  Answer:  Yes.

"8. Were said sketches approved by the defendant?  Answer: No.

"9. Were the articles which were shipped to defendant made according to said sketches?  Answer: Yes."

It would seem, therefore, that the trial court concluded that because the sizes had been changed and the change had not been approved, the contract had been departed from so that the plaintiff was not entitled to recover.   The jury were instructed that the plaintiff was bound to manufacture and deliver the transfers in strict conformity with the order, and that a failure so to do would be sufficient ground to refuse acceptance.   The defendant's position is thus stated in its brief.

"There is no question in this case concerning defects in the articles manufactured.   Appellee simply contends that it is not liable on the contract because appellant never *performed the contract* and not because appellant substantially performed the contract and made a breach of *warranty* as to quality.   The question as to what reason appellee had for refusing to accept the shipment is not material. . . .   It makes no difference why appellee refused the shipment, because before appellant can recover on the contract it must prove that it shipped to appellee the identical articles ordered."

The plaintiff insists that the variance was immaterial and one that rendered the articles no less usable and valuable than they otherwise would have been. Attention is called to authorities holding that an implied warranty does not go with the sale of mill machinery by a dealer that it shall answer the particular purpose intended (*Ehrsam v. Brown,* 76 Kan. 206, 91 Pac. 179) ; that a refusal to accept on account of dissatisfaction must be in good faith (*Hollingsworth v. Colthurst,* 78 Kan. 455, 96 Pac. 851; *Ramey v. Thorson,* 94 Kan. 150, 146 Pac. 315), and other decisions more or less analogous. But the question here concerns a variance from the sizes of articles ordered, not a divergence in quality or a lack of fitness for the desired purpose. Even in such a case it has been held that a sale of goods of a described quality implies a warranty of such quality. (*Johnston v. Lanter,* 87 Kan. 32, 123 Pac. 719.) There the order was for No. 1 cypress lath, and while it was stated as the general rule that prompt inspection and rejection with notification must follow receipt of the article ordered, promptness was held to be a question of fact dependent on circumstances. In *Wolf v. Boston Veneer Box Co.,* 109 Mass. 68, the contract was to deliver monthly throughout the year logs averaging a certain diameter, option with the defendant to end the contract at any time and pay the cost of the logs on hand. He ended the contract in October and was held liable for the cost of the logs then on hand though not up to the average, but upon the ground that had the contract continued to the end of the year the average might have been brought up. In *Forke v. E. C. Meacham Arms Co.,* (Texas, 1892) 19 S. W. 550, a shipment of bullets was refused because not packed in the usual style of box. It was decided, however, that the bullets ordered having been sent, and the style of box not having been indicated by the defendant, he must pay. *Loftus v. Riley & Co.,* 83 Iowa, 503, 50 N. W. 17, is cited in support of the argument that substantial correspondence with the specifications is sufficient, but in that case, involving a large order of paving blocks, the circumstances were such that the decision does not materially assist in the determination of the case before us.

The record here shows that there is no market for the articles refused, such things being manufactured to fill special

orders and not otherwise salable. There is much to indicate a purpose to refuse the shipment because too large an order had been given. The jury found for the plaintiff but at the same time said that the articles shipped were not of the sizes ordered, but were made after sketches not approved by the defendant, the equivalent of saying that the plaintiff sold one kind and delivered another kind of article. Not only was this inconsistent with the general verdict, but it was deemed by the trial court to be within the rule requiring judgment on the special findings. The majority of the court hold such ruling to have been correct. (*Hogue v. Mackey,* 44 Kan. 277, 24 Pac. 477; *L. N. & S. Rly. Co. v. Wilkins,* 45 Kan. 674, 26 Pac. 16; *Windmill Co. v. Buchanan,* 46 Kan. 314, 26 Pac. 708; *School District v. Lund,* 51 Kan. 731, 33 Pac. 595; *Kansas City v. Brady,* 52 Kan. 297, 34 Pac. 884; *Beech v. Railway Co.,* 85 Kan. 90, 116 Pac. 213; *McClain v. Railway Co.,* 89 Kan. 24, 130 Pac. 646.)

The judgment is affirmed.

PORTER, J. (dissenting) : Not until after the suit was brought did the defendant suggest as a reason for escaping liability the fact that it had never approved the designs. That this defense is an attempt of defendant to mend its hold is obvious from the manner in which the answer refers to the matter and what its counsel said in his opening statement to the jury. The answer states:

". . . That defendant never approved of said sketches, and never at any time or in any manner authorized the plaintiff to make the nameplates it alleges it has manufactured for the defendant."

Whether it ever authorized the plaintiff to make the identical name plates is not important. It gave the unconditional order, knowing the goods had to be manufactured before the order could be filled. In the opening statement for defendant it was said:

"Six hundred and some odd dollars' worth of those papers would be an excessive expense to the company. They would not use them up in five or ten years, perhaps, and so in good faith he went to these other oil companies to try to get them to join in and take a part of it, and if he could, why he would direct Mr. Meyer to send this order in, and he couldn't. They wouldn't take any of them, and so the order was never given to Meyer to send the order in."

The jury find that the defendant gave the written order for the goods. When asked the question whether the defendant approved the designs, the jury answered correctly in the negative, but there are two reasons why this finding furnishes no possible ground for defense to the action to recover the purchase price.

*First,* the contract contained no provision that designs should be submitted by plaintiff and approved by defendant before the contract became binding. It was an unconditional order for certain goods to be manufactured and delivered by plaintiff at prices named, and when the order was accepted by plaintiff it bound defendant to receive and pay for the goods unless they were not made according to the contract. The sales manager of the defendant testified that he never examined the goods when the shipment arrived, and that he gave orders that they were to be returned without examination or inspection.

*Second,* this court has repeatedly held that "where a party gives a reason for his conduct and decision touching anything involved in a controversy, he can not, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law." The foregoing language is taken from *Railway Co. v. McCarthy,* 96 U. S. 258, 267, and was approved in *Redinger v. Jones,* 68 Kan. 627, 637, 75 Pac. 997, and again in *Sandefur v. Hines,* 69 Kan. 168, 171, 76 Pac. 444. In the last case cited the syllabus reads:

"Where a party bases his refusal to consummate a sale of property in accordance with an alleged agreement upon one ground, he can not, after litigation has begun, change his position and defend such refusal upon another and wholly different ground." (Syl. ¶ 2.)

The same doctrine was approved and followed in *Stanton v. Barnes,* 72 Kan. 541, 84 Pac. 116. In that case certain grounds were stated for refusing to complete a contract, but no objection was raised upon an additional ground which was first offered as a defense after action was begun. It was held that it was too late to urge the other ground not presented in the first instance.

If defendant was intending to rely upon the fact that it had

Palm & Co. v. Oil Co.

not approved the designs, what did it mean by the letter written after being informed that the manufacture of the goods had been commenced, in which it stated "we can not entertain your proposition in your letter at all, *and as soon as we need them, we will order them out?"* ·

The order was given in February, and as late as July 23 defendant wrote plaintiff a letter in which it states:

"And we asked him to hold the order until such time as we could have the order come forward. . . . After giving you such positive instructions not to make shipment of these goods, we feel as though we are not under any obligation to your company."

Winters, the sales manager of the defendant, testified that he did not know whether the labels could be used; he did not refuse to accept the order for that reason. "Q. What was your reason? A. Because we could n't use that many, and they had n't gone according to our instructions." His testimony, together with his letters written to the plaintiff, shows that the defendant refused to accept the goods because it had given too large an order and had not been able to induce other oil companies to take part of the goods, and also that the "instructions" to which the witness referred in his testimony meant instructions contained in letters directing plaintiff not to ship the goods until further orders. The contract, however, contained no provision that the goods were not to be manufactured nor shipped until the defendant should further direct the plaintiff. The sales manager testified that he had been unable to induce other oil companies to accept a part of the goods, and that this fact was one reason for his attempted cancellation of the contract. The jury have found that the plaintiff's salesman never agreed with the defendant that sketches of the name plates would be submitted to the defendant for approval before manufacture.

I think the trial court erred in setting aside the verdict and findings and in granting a new trial. As I construe the contract the findings are perfectly consistent with the evidence and the general verdict. The trial court apparently concluded either that the defendant could modify the contract by subsequent letters instructing plaintiff not to forward the goods until further notice, or else that there was no liability because defendant had not approved the designs. The latter reason

was never suggested as a ground for refusing to accept and pay for the goods until after the litigation commenced, and to allow it is to permit defendant to mend its hold. The other involves a misconception of the contract.

In my opinion the judgment should be reversed and remanded, with directions to enter judgment on the verdict and special findings in favor of the plaintiff.

MARSHALL, J. (dissenting) : The special findings of the jury do not justify judgment for the defendant as against the general verdict, and for that reason the judgment should be reversed and a new trial directed.

WEST, J., authorizes me to say that he concurs in this dissent. (*Ratliff v. Railroad Co.,* 86 Kan. 938, 122 Pac. 1023.)