No. 33,746

Gertrude Swengel, *Appellee*, v. The F. & E. Wholesale Grocery Company, *Appellant*.

(77 P. 2d 930)

Opinion filed April 9, 1938.

*Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester L. Morris, George B. Powers, Carl T. Smith, C. H. Morris* and *John F. Eberhardt,* all of Wichita, for the appellant.

*William J. Wertz, Vincent F. Hiebsch* and *Forest V. McCalley,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Thiele, J.: This was an action to recover for damages alleged to have been sustained from consumption of canned sauerkraut juice, and from an adverse judgment the defendant appeals.

Omitting allegations not material to the appeal, plaintiff alleged that defendant, a wholesale grocery company, had sold certain Libby's sauerkraut juice put up in cans, to Mabel McCully, who conducted a retail grocery store in Wichita, Kan., representing that the juice was fit for use and immediate human consumption; that plaintiff bought five cans of the juice from the McCully store, and partook of the contents of one can; that the juice was not fit for human consumption or immediate use and contained harmful ingredients; that plaintiff, as a result of using the juice, suffered illness and injuries for which she sought damages. The gist of the answer, aside from a general denial, was that defendant did not at any time engage in packing or canning kraut juice, nor did it pack the kraut juice alleged to have caused injury to plaintiff, and if it did sell the kraut juice to Mabel McCully, as alleged in the petition, it had no opportunity of inspecting or opening the can of kraut juice for inspection to ascertain the condition of the contents.

As far as now need be noticed, the proof showed that Mrs. McCully purchased the particular kraut juice from the defendant; that plaintiff's husband went to the McCully store, where other brands were also sold, and purchased five cans of Libby's kraut juice, which he took home. A few days later, his wife opened one can, the lid was corroded and had black spots around it, and she dumped the contents in the sink. She opened three more cans, and the lids being in the same condition, she poured the contents in a milk bottle and did not use them. She opened the fifth can, and it appearing all right, she poured out a teaglassful and, after drinking about half of it, noticed particles in it. She poured the remainder of the can in the glass and found the bottom of the can was in the same condition as the other cans. The family, consisting of herself, her husband and two children, all partook of the same meal that evening, although she alone drank any of the juice. The next morning her eyes began to swell and thereafter she was ill. There is no contention she was not seriously ill for some days and we need not detail any evidence with respect thereto. There was proof that the juice had particles or flakes in it, which some of the witnesses said were like tin or a metal of some kind. We will not detail the evidence showing that the cans were ultimately returned to the packer, and the evidence tending to show that the cans were not defective and that the juice therein was not unfit. The jury returned a verdict for plaintiff and answered special questions as follows:

"1. Did the defendant company manufacture the kraut juice involved? A. No.

"2. Was the illness of the plaintiff directly and proximately caused by the drinking of kraut juice in question? A. Yes.

"3. Was the kraut juice which was consumed by the plaintiff of wholesome quality? A. No.

"4. If you answer question 3 'No,' then state whether said kraut juice contained:

      (a) lead poisoning? A. No.

      (b) tin poisoning? A. No.

      (c) other metallic poisoning *Iron?* A. Yes.

"5. Was the illness of the plaintiff caused by

      (a) food poisoning? A. Yes.

      (b) an allergy? A. No.

"6. What amount, if anything, do you allow the plaintiff for—

      (a) pain and suffering? A. $1,500.

      (b) permanent injuries? A. $———."

Defendant's various post-trial motions were denied, and it appeals.

The appellant presents four questions for consideration. The first two presented together are: Does an implied warranty of fitness for human consumption exist between a wholesale grocer and the wife of a purchaser from a retail dealer in sales of canned goods in their original packages? And, does such implied warranty exist when the purchaser requests the dealer to supply him with the particular food of which complaint is made?

On the assumption that this appeal is the first of its type to reach this court, and therefore novel, appellant in its brief calls our attention to many authorities with reference to implied warranty of fitness for human consumption of food packed in cans and containers; to the liability of an intermediate dealer where the food is placed in cans by manufacturers and processors, and is no more open to inspection by the intermediate dealer or the immediate seller than it is to the purchaser consumer; to whether or not there is any privity of contract between the purchaser consumer and anyone other than the immediate seller. Among those cited are: *Degouveia v. H. D. Lee Mercantile Co.*, (Mo. App.) 100 S. W. 2d 336; *Julian v. Laubenberger*, 38 N. Y. S. 1052; *Flaccomio v. Eysink*, 129 Md. 367, 100 Atl. 510; 4 Williston on Contracts, Revised ed. p. 2742; *Aronowitz v. F. W. Woolworth Co.*, 236 N. Y. S. 133, 134 Misc. Rep. 272; *Pennington v. Fuel Co.*, 117 W. Va. 680, 186 S. E. 610; *Bigelow v. Maine Central Railroad Co.*, 110 Me. 105, 85 Atl. 396, 43 L. R. A., n. s., 627. The authorities cited cover various phases of the problem

as stated. It may be conceded that in each of the above authorities may be found statements tending to support appellant's claim of nonliability.

In any discussion of liability in cases similar to that here presented, it should be borne in mind that some decisions are affected by application of the uniform sales act or by other statutory provision, while others are treated from the standpoint of negligence, rather than warranty. In an annotation on "implied warranty by other than packer of fitness of food sold in sealed cans," 5 A. L. R. 248 (pub. 1920), it is said:

"There is a square conflict of authority upon the question whether or not a dealer, in selling food in sealed cans, impliedly warrants that it is wholesome and fit for food, it having been held both that there is and that there is not such a warranty.

"The preponderance, at least, of modern authority, is to the effect that upon the sale of food to be immediately put to domestic uses there is, as between the dealer and the consumer, an implied warranty that such food is wholesome and fit to be eaten. . . .

"Applying this doctrine, it has been held that an exception to the general rule arises in the case of canned goods, the theory being that, when the reason for the rule falls, the rule itself falls. In other words, it cannot be presumed that, in the case of goods sold in sealed cans, the dealer who did not make or pack them has a greater knowledge of the wholesomeness of the contents than the purchaser. . . .

"However, as above stated, there also is authority to the effect that there is no distinction between a sale of provisions open to inspection, and provisions packed in cans or sealed packages."

and decisions upholding both views are noted. See, also, the later annotation on the same subject in 90 A. L. R. 1269; also, 11 R. C. L. 1122; 26 C. J. 785; 55 C. J. 766. In an article in 34 Michigan Law Review, 494, entitled "Retail Responsibility and Judicial Law Making," an analytical review is made by Prof. John Barker Waite of some decisions touching liability for sale of foods, which discloses the contrariety of reasoning and holding of the various courts.

Not many cases involving fitness of food for human consumption have been before this court. In *Malone v. Jones*, 91 Kan. 815, 139 Pac. 387, plaintiff, employed as a farm laborer, recovered for damages sustained by reason of being fed unwholesome meat. The judgment was upheld on the ground of negligence. On rehearing, this court adhered to its first ruling (id., 92 Kan. 708, 142 Pac. 274). In *Parks v. Pie Co.*, 93 Kan. 334, 144 Pac. 202, plaintiff recovered a judgment for damages for the death of her husband, which was

caused by ptomaine poisoning resulting from eating a pie manufactured by the defendant pie company and sold by it to a retail grocer, also a defendant, who in turn sold it to the deceased. After reviewing the evidence, it was said:

"The degree of care required of a manufacturer or dealer in human food for immediate consumption is much greater by reason of the fearful consequences which may result from what would be slight negligence in manufacturing or selling food for animals. In the latter a higher degree of care should be required than in manufacturing or selling ordinary articles of commerce. A manufacturer or dealer who puts human food upon the market for sale or for immediate consumption does so upon an implied representation that it is wholesome for human consumption. Practically, he must know it is fit or take the consequences if it proves destructive. (*Tomlinson v. Armour & Co.,* 75 N. J. Law 748, 70 Atl. 314, 19 L. R. A., n. s., 923.)" (p. 337.)

and it was held:

"A dealer who sells human food for immediate consumption does so under an implied representation and guaranty that it is wholesome for the purpose for which it is sold.

"A manufacturer who prepares food for human consumption and places it in the hands of a dealer for sale is responsible in damages to the widow of a consumer who procures such food from the dealer and loses his life by partaking of such food." (Syl. ¶¶ 1, 2.)

The next case was *Challis v. Hartloff et al.,* 133 Kan. 221, 299 Pac. 586. The action was commenced on July 20, 1929. The petition alleged that on July 21, 1926, plaintiff purchased flour from a retail dealer, who purchased it from a broker who in turn had purchased it from a miller, all of them being defendants; that the flour contained a poisonous substance, and that plaintiff used the flour and suffered injuries. The appeal arose from overruling a demurrer on the ground that the cause of action was barred by the statute of limitations. Because of the manner in which the appeal arose, appellant in the case at bar argues that the question of implied warranty was assumed rather than adjudicated; that the question was not in that case and what was said with respect thereto was obiter dictum. It may be true that appellants in that case failed to fully present and argue the point. But it is just as apparent that it was a proper and necessary matter for consideration. If the action was for negligence, it was barred; if for breach of implied warranty, it was not; and so the court had before it whether either or all of the defendants were bound by implied warranty. The court made no extended discussion, but said:

"The implied warranty of each of the defendants was separate and distinct from that of the other defendants. It was a series of warranties by each seller to the immediate purchaser and such as would accumulate and assemble for the protection and benefit of the ultimate purchaser and consumer, but without any indication of unity of interest. The milling company could not know of the arrangement between the broker and the local merchant, nor of that between the local merchant and the plaintiff, nor did it know who these successive purchasers were. The fact that the implied warranty, as alleged, is the same as to each of the three defendants does not make them united in interest any more than if each had made and given a separate express warranty. They are each liable to the plaintiff on their warranties through the succession of sales and purchases, and can be sued together as was held in *Malone v. Jones,* 91 Kan. 815, 139 Pac. 387, and *Parks v. Pie Co.,* 93 Kan. 334, 144 Pac. 202, but may or may not be united in interest." (p. 222.)

Thereafter in that case in the trial court defendant filed an answer asserting defenses of the two-year statute of limitations, contributory negligence, estoppel, and negativing any possible carelessness on the part of each defendant. From an adverse ruling on his demurrer thereto, plaintiff appealed to this court, which reversed the trial court (136 Kan. 823, 18 P. 2d 199). In the course of the opinion it was said:

"The theory of the defendants is that although the petition is on its face an action for damages for breach of an implied warranty, yet the breach of a warranty is a wrong done by the defendants to the plaintiff from which he has suffered these damages, that the purchase, sale and handling of flour that is permitted to contain arsenic is necessarily an act of carelessness and.renders the action one in tort in spite of the studied efforts of the plaintiff to avoid it. The defendants earnestly contend it is a tort action and these defenses are proper and applicable, and further that it should be barred by the two-year statute of limitations." (p. 825.)

and after discussion of other matters, further said:

"In *Ryan v. Progressive Grocery Stores,* 255 N. Y. 388, 74 A. L. R. 339, an action for breach of implied warranty by a purchaser against a dealer who sold him a loaf of bread for immediate consumption as food, which contained a pin, it was held in an opinion recently written by Judge Cardozo that an implied warranty of the merchantable quality of bread sold is breached by the presence of a pin therein, that dealers as well as manufacturers affirm, as to anything they sell, if purchased by description, that it is of merchantable quality. The burden may be heavy. It is one of the hazards of the business. Concerning the amount recoverable it was claimed there, as here, that it was limited to the difference between a good loaf and a bad one, and the court said, 'The rule is not so stubborn . . . The measure is more liberal where special circumstances are present with proof of special damages.' (p. 295.) There the dealer had notice from the nature of the transaction that the bread was to be eaten. Knowledge that it was to be eaten was knowledge that the damage would be greater than the price.

"These views were approved and followed by the supreme court of Connecticut in the case of *Burkhardt v. Armour & Co.*, 115 Conn. 249, in an opinion handed down last July." (p. 826.)

In the more recent case of *Stanfield v. F. W. Woolworth Co.*, 143 Kan. 117, 53 P. 2d 878, plaintiff had gone to defendant's store and ordered a sandwich and a glass of Coca-Cola, which were immediately consumed. Shortly after she became violently ill. She recovered in an action for damages. In an exhaustive opinion involving other matters than those now before us, but in which many authorities are examined and classified, it was held:

"Plaintiff went into defendant's restaurant and ordered and paid for a ham-salad sandwich, which defendant delivered to her. *Held,* the transaction was a sale.

"One who, for compensation, sells or provides food for immediate consumption to another impliedly warrants the food to be wholesome. This is true whether the transaction is in all of its aspects properly classified as a sale.

"One to whom, for a compensation, food is sold or provided for immediate consumption, and who suffers food poisoning as a result of consuming the food, may maintain an action upon the implied warranty of its wholesomeness without alleging or proving negligence in the selection or preparation of the food by the one who sold or provided it." (Syl. ¶¶ 1, 2, 3.)

Under these decisions it must be held that in any case where a dealer sells articles of food for immediate human consumption, the purchaser may rely upon an implied warranty that such articles are wholesome and not deleterious, and in the event he sustains injuries from their use, he may waive any tort there may have been and maintain his cause of action upon such implied warranty. We are of the opinion, too, that such warranty is not limited to the immediate seller. While some authorities may be found holding that as between the manufacturer or packer and the ultimate consumer there is no privity of contract, and therefore the injured consumer may not maintain an action, the weight of authority is to the contrary. Assuming that such an action may be maintained, it seems illogical to hold that the injured consumer might maintain an action against the immediate seller or the manufacturer or packer, but not against the intermediate purchasers and sellers of the articles of food. To so hold would mean that if the immediate seller were financially irresponsible, and the packer, for instance, were located in a foreign country, the injured consumer would, from a practical standpoint, be without remedy. And it might be that by the time the articles were finally sold to a consumer, any right of action he

might have against the manufacturer or packer would be barred by the statute of limitations. We think the rule of intermediate liability stated in the Challis case, *supra*, is that which should be followed.

On the question that a different rule should be applied as to goods in cans and containers than as to bulk goods, it must be recognized that today practically every article of food except green groceries is packaged in some manner. If putting food in packages is to relieve all intermediate handlers and the immediate seller, then the injured consumer is relegated to his action against the manufacturer or packer. While it is true the purchaser has the same opportunity to inspect, prior to opening the package or container, as his immediate seller or the intermediate handler, he buys, at least in part, relying upon the fact the contents are supposedly wholesome and fit for immediate human consumption. It is also well known that many articles of food are sold by brand or name as the result of extensive advertising, in which purity, wholesomeness, price, etc., are stressed in varying degrees, and that insofar as manufacturers, packers and jobbers are concerned the purpose is to challenge attention to the brand or name and to create a demand therefor. Insofar as the local dealer is concerned, he stocks and sells these advertised goods because of that demand. Although in the case at bar an argument is made that the purchaser, by calling for a particular brand, waived his right to rely on implied warranty, we think it should not be so held. We think that a merchant, in displaying articles of food for sale, impliedly warrants that each and all of the articles are fit, whether of well known or little known brands, or whether packaged or not, and that the fact the purchaser chooses one or the other should not relieve the dealer. And if the dealer is liable, under the circumstances instant in this case, so are the intermediate handlers.

Appellant further contends that appellee failed to establish breach of the implied warranty of fitness for human consumption. It is very properly contended that the burden of proving a breach of the implied warranty was on the plaintiff, and that that burden was not sustained simply by showing she drank the kraut juice and subsequently became ill. Although plaintiff produced proof that the kraut juice not only from the can from which she drank, but from the other cans which she saved, was dark and turbid, and had therein some flaky matter which was precipitated when allowed to stand,

there was no proof that any chemical or other analysis was made further than that of her husband and doctor, each of whom stated he rubbed the precipitate between his fingers and it felt metallic. It is insisted there is no proof plaintiff drank any of these metallic particles. Plaintiff testified she drank of the juice and noticed the flakes in it and drank no more. We think it a fair inference she may have taken some of the flakes into her body. During the cross-examination of plaintiff and her physician, an effort was made to show that plaintiff was allergic to sauerkraut juice and that her physical difficulties following her drinking from that particular can were not attributable to any unwholesome quality of the kraut juice. An effort was also made to have plaintiff's physician say definitely that plaintiff was suffering from metallic poisoning rather than food poisoning. The testimony showed that on the evening the kraut juice was used, plaintiff, her husband and her two children, all partook of the same food with the exception that none except the plaintiff drank any of the kraut juice. The plaintiff, who was the only one to drink the juice, was likewise the only one to become ill. There was also testimony that she had used kraut juice for some years before the particular illness, and on occasions thereafter, always without bad result. Possibly the physician's statements are contradictory in part as to just what caused plaintiff's illness, but as against a demurrer she was entitled to every favorable statement and inference therefrom, and was not prejudiced by any unfavorable statement or inference. The doctor on cross-examination testified:

"Q. What kind of poisoning would you say Mrs. Swengel was suffering from? A. As nearly as I can determine it was from drinking kraut juice. Just exactly what caused it I cannot tell you.

"Q. And would you call it metallic poisoning? A. I would call it more of a food poisoning."

At a later time he testified as follows:

"Q. To come right down to it, what reason do you assign for the conclusion that you have reached here that Mrs. Swengel was suffering from a metallic poisoning, in view of the symptoms which she had? A. I don't say that it was strictly metallic poisoning; it was probably a food poisoning.

"Q. By food poisoning what do you mean? A. I mean a condition of the intestinal tract; an irritation of the intestinal tract that has been irritated by impure food."

And still later he stated:

"I made up my mind that this was food poisoning on the first or second call at the Swengel home."

He consistently stated that plaintiff's condition was not allergic and was not caused by drinking juice or eating food that produced an allergic condition. In view of the evidence already mentioned and the further proof that the juice had a terrible odor which plaintiff did not immediately detect, and the condition of the cans, we think the plaintiff did more than merely show she drank the kraut juice and subsequently became ill. She made a showing sufficient that the trial court properly overruled the demurrer of her evidence.

And finally, it is insisted the trial court erred in not sustaining certain post-trial motions. The principal complaint is that the answer to special question 4 (c) is not sustained by the evidence. It will be noticed that as framed the answers called for referred to metallic poisonings. There is evidence that the cans when opened contained spots where the metal had come off. Defendant's own medical witness testified, as abstracted:

"Cans are composed of sheet iron with a thin covering of tin. Iron produces iron oxide. It is not poison in certain quantities. It is possible that if the kraut juice ate through the tin of a can and through the iron and produced an iron oxide, that it might be poison. If the tin was broken on the inside it might eat through into the sheet iron a little bit."

We cannot say the answer is not supported by the evidence. Neither can it be said the answers are either inconsistent with themselves or with the general verdict. While the fourth question referred to metallic poisoning, the fifth made no such reference. We must interpret the answer to the fifth question in the light of the other questions and answers. As has been shown heretofore, an effort was made to show that plaintiff was suffering from an allergy rather than from food poisoning and the question seems to have been asked with that in view. But, if not, we have some difficulty in saying that a person partaking of food containing iron oxide in poisonous quantities does not suffer from food poisoning. Had the jury answered question 5 (a) "No," the obvious argument would have been that the kraut juice, even though containing iron, did not cause plaintiff's illness. We think the trial court properly ruled on the post-trial motions, including the motion for a new trial.

The judgment of the trial court is affirmed.