**BURRUS FEED MILLS, INC., et al.,**
Appellants,

v.

**W. A. REEDER, Appellee.**

No. 7467.

Court of Civil Appeals of Texas,
Amarillo.

May 17, 1965.

Day & Owen, Chas. H. Dean, Plainview, for appellants.

Stovall & Stovall, Plainview, for appellee.

CHAPMAN, Justice.

This is a products liability case tried to a jury upon the theory adopted by the trial court to the effect that the rule of "implied warranty" as announced by our Supreme Court in Decker & Sons v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479, has application to food mixed and processed by the manufacturer and sold for immediate consumption by animals.

The Decker case announced the principle that a non-negligent processor could be held liable in damages to a person injured from eating contaminated food prepared by such processor, although there was no privity of contract between the latter and the consumer of the contaminated food.

As pointed out in effect by our former, revered Chief Justice Alexander in Decker, there is no unanimity in the various jurisdictions upon the question, and many courts have insisted strictly on the requirement of privity. However, even as far back as 1942 when the Decker case was announced that court said: "There is a growing tendency * * * to discard the requirement of privity and to hold the manufacturer liable directly to the ultimate consumer."

Thus, to affirm the instant case we must extend the doctrine beyond that to which our Supreme Court has as yet given assent, though so far as we have been able to determine, they have in no case yet refused to extend the doctrine. We believe this to be an appropriate case for such extension.

Appellee Reeder was a breeder of Quarter Horses, some of which carried the top blood lines of the breed. Among these was a two-year old stallion by the name of General Champ.

The evidence indicates that under the rule of genetics, even when two top blood lines are crossed in a breeding program, sometimes the result is not favorable. But in the case of General Champ, a foal out of Miss Cuba Girl by General Roy, those two blood lines "nicked" and he was a top two-year old stallion. Though his value was placed as high as $12,000 by one Quarter Horse breeder, the most reliable testimony of an expert in the Quarter Horse business who knew both the blood lines and the individual colt from the time he was foaled showed him to be worth between $7,000 and $10,000, " * * * he could have expected to have sold from $7,000 to $10,000." This witness was Bob Hooper, one of the original organizers of the American Quarter Horse Association who served as its president for four consecutive years; who has bred, raised and

owned such horses even before there was an official registry association; who owned approximately 150 head of horses in 1962, 75 of which were registered Quarter Horses; and who has judged all the major shows in the United States, including the Kansas City Royal, the National Western at Denver, the Cow Palace at San Francisco, and the International Livestock Show at Chicago.

On July 28, 1962, Burrus Feed Mills, Inc. delivered to Plainview for Roy Philpot, a retail dealer, by way of rail, 80 100-pound sacks of feed mixed and designed by them for horse feed and labeled "Hearts Delight Heavy Duty Horse and Mule Feed," manufactured by them. Also written on the said sack was the slogan: "Be Sure You're Right—Use Hearts Delight." The feed was shipped in what was referred to in the record as "toe" sacks, and the exhibits of which show to be loose woven burlap sacks. Each sack contained a tag which guaranteed the analysis. In none of the ingredients was there a mention of arsenic poison, of course.

Appellee had ordered from the retail dealer some of the described feed. Mr. Philpot was out of the feed at the time but soon afterwards, to wit, on July 28, 1962, the railway car from Burrus Mills, Inc. was spotted on the tracks with the feed and appellant Philpot went to the car, picked up 2 of the 100-pound sacks, placed them in his pickup and personally delivered them to appellee about 5:00 p. m. that afternoon by placing them in the consumer's pickup. The evidence eliminates any possibility of arsenic poison in the two pickups that handled the feed after it left the railway car. Appellee then took the two sacks of feed to his barn, emptied them in a clean feed container and then filled a five-gallon bucket, which he emptied in the feed trough in his horse lot. There was no other feed in the trough at the time and there were three horses in the lot for which the horse feed was designed, all young stallions.

The two sacks were emptied one at a time in the feed container. A clean sack was emptied first and the sack that later showed a stiff spot on it and which the evidence showed to contain arsenic poison was emptied on top of the other. The five-gallon feed can was filled from the top part of the feed container.

General Champ was the boss in the lot over the other two horses. All became ill soon after eating the feed but despite all a veterinarian could do for General Champ he succumbed on Monday, July 30, at 3:00 o'clock p. m., following the feeding on the previous Saturday.

The next day appellant Philpot, James Pulliam, a Burrus Feed Mill representative, and appellee, while discussing the horse's death, went to the horse lot and Mr. Pulliam noticed a stain on one of the feed sacks. It was the sack which had been emptied into the feed container last and which logically contained some of the feed that had been consumed by the three horses. The men then made an investigation of the railway car in which the feed had been shipped. The car was in excellent condition, being lined with clean paper on both the bottom and sides. There was one stain on the paper at the precise place where the sack of feed had been taken from, about four feet up from the floor of the railway car where the sack had been lying against the paper. The stain was also on the side of the paper next to the sack.

Dr. Joe Braden, the attending veterinarian, who performed a complete post-mortem on General Champ testified that in his opinion, the horse died from arsenic poison which was in a soluble form.

The Chief of Police sent a sample of the stained part of the burlap sack to the Texas Department of Public Safety and Mr. Charles G. Smith, a chemist in the department, testified by deposition, after performing a chemical analysis on the stained feed sack, that the burlap contained arsenic poison. Fecal material saved from

the horse while he was sick was sent in a plastic container to Terrell Laboratories in Fort Worth. Mrs. Jane Hester, a chemist for the laboratory, after making a chemical analysis of the fecal material after it was completely dried out, testified it contained arsenic.

Without further detailing the evidence we are compelled to say it was abundantly sufficient to show the particular sack from which the food was ingested by the horses, including General Champ, contained arsenic poison by a heavy metal, arsenic being so classified, that such poison was in soluble form, and that a sufficient amount of it was in the feed of the stained sack when removed from the railway car to produce the illness in the three horses and the death of the "boss of the corral," General Champ.

■ As to appellant, Roy Philpot, there is no question that under the present rules of law in our state, so far as our Courts of Civil Appeals have spoken, a cause of action was proven because a privity of contract was established between him and appellee. Wilderspin v. Bewley Mills, Inc., Tex.Civ.App., 298 S.W.2d 636 (N.R.E.). There the ranchman had bought Bewley's Anchor Range Chunkets and fed to his cattle. More than a hundred died, many more were condemned as unfit for beef for human consumption and the others sold. The Fort Worth Court of Civil Appeals held:

"'On a sale of food or provisions for "immediate consumption," the seller impliedly warrants that the commodity is wholesome and fit for the intended use. The warranty applies to a sale of stock feed, as well as to a sale of food for human consumption, made by a retail dealer to a consumer, where the purpose of the latter is understood. * * *'"

Appellants cite Brown v. Howard, 285 S.W.2d 752, as authority for their position against privity, but that case is nowhere analogous to the facts of our case. That case involved chemicals sold for cattle spray. The ingredients were shown on the container, several of which were toxic. The cattle to be sprayed were Brahman. One of the chemicals shown on the container was chlordane. Evidence shows that Brahman cattle, because of their sweat glands in the skin, are more susceptible to chlordane poisoning than other breeds of cattle. This consumer was warned, whereas consumers of "Hearts Delight Feeds" would be attracted to its use for internal consumption by horses and mules.

Other jurisdictions have extended the exception and held that proof of privity is not required where food is sold for consumption by animals. McAfee v. Cargill, Inc., 121 F.Supp. 5. There a United States District Court held lack of privity would be no bar to the buyer's action against the manufacturer of dog food for breach of warranty.

At a time when the privity requirement was viewed in Massachusetts as subject to an exception in the case of injury caused by food and drugs intended for human consumption the courts of that state refused to extend this exception to include foods and drugs intended for hens. Tompkins v. Quaker Oats Co., (1921) 239 Mass. 147, 131 N.E. 456. In 1946 the Supreme Court of that state rejected the early doctrine of that jurisdiction as represented by Tompkins v. Quaker Oats Co., supra, and in Carter v. Yardley & Co., 319 Mass. 92, 64 N.E.2d 693, 74 A.L.R.2d 1189, Section 20, held:

"The time has come for us to recognize that that asserted general rule (non-liability to persons not in privity of contract) no longer exists. In principle it was unsound. It tended to produce unjust results. It has been abandoned by the great weight of authority elsewhere. We now abandon it in this Commonwealth." (Parenthetical statement ours).

This was a case not even involving articles manufactured or processed for food, but involved perfume that contained an ingredient that burned a person's face.

We are not completely without support in Texas upon the reasoning of our courts on the privity question here under discussion. The Waco Court of Civil Appeals in International Milling Co. v. Jernigan, Tex. Civ.App., 191 S.W.2d 526, in a plea of privilege question had a situation before it where the manufacturer labeled wheat bran as being free from poison, sold it to the retail dealer, and Jernigan purchased it from the dealer, McLeod. The consumer sued the manufacturer and McLeod jointly. The court held:

"If the International Milling Company did, as alleged by the plaintiff, manufacture and sack the said bran and label it as being free from poison and put it on the market to be used for livestock feed, it certainly warranted said bran to be fit for livestock consumption. When V. E. McLeod sold the same to the plaintiff he also impliedly warranted it to be fit to be fed to livestock. While the plaintiff did not use the exact word 'warrant' in his petition, he nevertheless set out facts sufficient to show that the defendants did warrant the fitness of the bran in question, and in his prayer he prayed for judgment against all of the defendants jointly and severally and thereby alleged a joint cause of action against McLeod and the International Milling Company."

The record in our case shows one witness owned a Quarter Horse for which he had paid $30,000. It is common knowledge in this state that many breeders of horses and cattle own animals worth from $10,000 to $50,000; that processed feeds such as in the instant case are purchased for horses from retailers who would not be subject to execution and that cotton seed cake and pellets are purchased from "small" retail dealers whose assets could not satisfy a judgment for even one such animal. Thus, on the theory of non-liability to persons not in privity of contract it could, for all practical purposes, be said where one or many such fine and expensive animals are poisoned by feed sold by a manufacturer or processor to a retail dealer not subject to execution under warranty on their labels that it is clean and wholesome for consumption by animals and such dealer for a small profit sells such feed to the eventual consumer, such consumer has a cause without a remedy. We agree with the Supreme Court of Massachusetts that the theory of lack of privity is unsound and produces unjust results and we agree with the United States District Court in California wherein it held: "The same public policy considerations present for the protection of humans in the use of packaged and processed foods are also present where instead we deal with animals." McAfee v. Cargill, Inc., supra.

With respect to food manufactured or processed for human consumption our Supreme Court has settled the question that: "Liability * * * is not based on negligence, nor on a breach of the usual contractual warranty, but on the broad principle of the public policy to protect human health and life." Decker & Sons, Inc., v. Capps, supra; Griggs Canning Co. v. Josey, 139 Tex. 623, 164 S.W.2d 835, 142 A.L.R. 1424.

It has been textually stated[1] that: "The general trend of the cases * * * from Winterbottom v. Wright[2] to Henningsen v. Bloomfield Motors[3] seems to be steadily in the direction of warranty liability regardless of privity of contract."

1. Insurance Counsel Journal, July 1964, page 441 (issued quarterly by International Association of Insurance Counsel).

2. 10 M. & W. 109, 11 L.J.Ex. 415 (an old English case in 1842).

3. 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1.

In Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S. 2d 363, 181 N.E.2d 399, the court in discussing this subject said:

"The world of merchandising is * * * no longer a world of * * * contract; it is, rather, a world of advertising and, when representations expressed * * * on labels (attached to the goods themselves) prove false and the user or consumer is damaged by reason of his reliance on those representations, it is difficult to justify the manufacturer's denial of liability on the sole ground of the absence of technical privity."

The manufacturers and processors of packaged foods are not without protection.

"Insurance had satisfactorily relieved manufacturers of other risks, beginning with marine perils in the 12th century, fire in the 17th century, and, more recently, the general liability risks late in the 19th century. It was only natural, therefore, that insurance was expected to respond to this new need for protection against products liability." [4]

The jury found that when the horse feed in question was delivered to Roy Philpot by Burrus Mills, Inc., it contained arsenic poison; that when it was delivered by the retail dealer to appellee it contained arsenic poison; and that the ingestion of the feed by General Champ was a producing cause of the horse's death.

■ We are not unmindful of the fact that the Burrus Mills loaders testified the spot on which the poison was found was not there when the sack was loaded. Under the strong circumstances in this case indicating the contrary the jury was not obligated to believe their testimony. Mr. Philpot did not notice it when he loaded the sack. Mr. Reeder did not notice it when he emptied the feed. The jury could

just as well have believed the loaders did not notice it when they placed it in the railway car. The record is clear that the particular sack of feed in question was not suited for its intended use; there are circumstances of probative force that the poison was in the particular sack when loaded on the railway car by appellant Burrus; there is no question but that the feed was used for the purpose intended; and thus, there was a causal relation between the product and the death of General Champ. We therefore hold that this is a case that constitutes an exception to the necessity of proving privity between the eventual user and the manufacturer and processor.

Our Supreme Court in Decker said: "We think the manufacturer is liable in such a case under an implied warranty imposed by operation of law as a matter of public policy."

As heretofore stated the court in McAfee v. Cargill, Inc., supra, said: "The same public policy considerations present for the protection of humans in the use of packaged and processed foods are also present where instead we deal with animals."

In a capitalistic society such as we enjoy and which guarantees one protection of his person, the law should also secure him in the possession of his property. We believe an extension of the doctrine of privity is necessary in this state in order to protect the consumer under facts such as we have here. We limit our holding to feed manufactured or processed for consumption by animals and advertised or labeled for such purpose.

■ Appellant next asserts error of the court in overruling their objections to the court's charge wherein the term "producing cause" was used in the third issue instead of "proximate cause."

The term was defined as "an efficient, exciting, or contributing cause which in

4. Insurance Counsel Journal, July 1964, (Current Problems and Products Liability Law and Products Liability Insurance) page 441, third paragraph, right-hand column.

a natural and continuous sequence produces the injuries or damages complained of." Proximate cause is the definition used in negligence cases; and if we are correct in our holding that privity is not required, the negligent concept is not a part of the case. Decker & Sons v. Capps, supra; Griggs Canning Co. v. Josey, supra. Therefore, the point is overruled.

■ The third point raises the question of no evidence and factually insufficient evidence to support the findings of the jury that when the feed was delivered to Roy Philpot it contained arsenic poison. We feel that what we have said in a discussion of the first point fully covers the question raised in this point and that further discussion would constitute only repetition.

■ The fourth point complains of error of the court in permitting testimony by appellee's witnesses as to the value of the deceased horse in his lifetime. This point is not well taken.

Reliable and qualified witnesses testified there would be no difference in the value of the Quarter Horse in Hale County and in the surrounding territory and testified to the value of General Champ in and around Hale County. There is even some testimony of his value in that county.

■ The next point asserts error of the court in allowing interest from the date of death rather than the date of judgment.

A rule contrary to this contention seems to have been settled by our Supreme Court at an early date in Watkins v. Junker, 90 Tex. 584, 40 S.W. 11. There the court said:

"If interest be properly an element of damages in any case, then it is so as a matter of law. * * * and we believe that, practically, the courts have come to the proposition that, in cases where the measure of recovery is fixed by the conditions existing at the time that the injury is inflicted, the person entitled to recover has also the right to have compensation for the detention of the money to which he is entitled by reason of the wrong done to him. * * *

"If one takes possession of the horse of another, and withholds it from the owner, compensation for the value of the use of the horse during the time is a legal right, and no court would hesitate to instruct the jury to so find, and we can see no difference between the right to be compensated for detaining a horse worth $100, and the right to be compensated for the detention of $100, the value of the horse, in case he was killed or converted to the use of the taker."

This rule seems to have been followed consistently by our courts. Ewing v. Wm. L. Foley, Inc., 115 Tex. 222, 280 S.W. 499, 44 A.L.R. 627; Texas Co. v. State, 154 Tex. 494, 281 S.W.2d 83.

Here the evidence shows the horse was just ready for stud service and that appellee could have expected to receive $200 a stud service for fifteen to twenty such services each year. Therefore, appellee was damaged from the date of the horse's death. In Ricks v. Culp, Tex.Civ.App., 206 S.W.2d 285, 287, the court said: "Nor is a jury finding thereon necessary, where the case is submitted upon special issues. Ewing v. Wm. L. Foley, 115 Tex. 222, 280 S.W. 499, 44 A.L.R. 627; Miller v. Miller, Tex.Civ.App., 292 S.W. 917, error ref."

■ In the next point appellant asserts error of the court in refusing to submit an issue as to whether the sack of feed in question had any visible defects at the time it was sold by Roy Philpot to W. A. Reeder and if W. A. Reeder had an opportunity equal to that of Roy Philpot to examine the sack of feed.

We believe the first requested issue is evidentiary but even if both issues were

proper inquiries for this type case, they are issues upon which appellants depended for their affirmative defenses and there is not any affirmative pleading to support them in either of appellants' pleadings upon which they went to trial. Rule 279, Vernon's Ann.Texas Rules provides:

"* * * a party shall not be entitled to an affirmative submission of any issue in his behalf where such issue is raised only by a general denial and not by an affirmative written pleading on his part."

The point is overruled.

 The last point asserts reversible error of the court in refusing to allow appellants "to ask appellee and require him to answer whether he had rendered the horse in question for ad valorem taxation." The record as we read it shows counsel asked appellee: "And will you state to us what you assessed that valuable personal property for for taxation—" "Well, we'll just ask this. In 1961 and 1962, what did you assess the value of these two valuable horses for?"

He was asked not only about General Champ but also about another horse named Ramo for whom appellee testified he turned down $12,000.

"Q. Turned down $12,000 for Ramo?

A. Yes."

In the first place the inquiry of the value of another horse was not material in this record. Secondly, appellee testified he had not personally rendered his horses for taxation.

As to real estate the San Antonio Court of Civil Appeals has held that even if the value of the land was fixed by the owner, when it was assessed for taxation, it would form no criterion for its value in a condemnation proceeding. Crystal City & U. R. Co. v. Isbell, Tex.Civ.App., 126 S.W. 47 (N.W.H.). In any event, it was shown here that appellee had not personally ren-

dered the horse in question for taxes so the record could not show an admission against interest. In Boyer & Lucas v. St. Louis, S. F. & T. Ry. Co., 97 Tex. 107, 76 S.W. 441, our Supreme Court said:

"* * * the only effect the rendition can have * * * is as evidence of an admission, and their weight as such may depend upon proof of what the party to be affected by it said and did."

Appellee having not rendered the horse for ad valorem taxation at all, there was not anything to prove in that connection against interest.

Accordingly, the judgment of the trial court is in all things affirmed.