No. 44,703

RALPH S. CHANDLER, *Appellant,* v. ANCHOR SERUM COMPANY, and FARMERS CO-OP ELEVATOR, and KANSAS FARMERS UNION SERUM Co., *Appellees.*

(426 P. 2d 82)

Opinion filed April 8, 1967.

Richard C. Byrd, of Ottawa, argued the cause, and *Robert A. Anderson, James G. Kahler, Kenton C. Granger,* and *John L. Richeson,* of Ottawa, were with him on the brief for the appellant.

Richard O. Skoog, of Ottawa, argued the cause, and *John B. Pierson,* of Ottawa, was with him on the brief for the appellee, Anchor Serum Company.

J. H. Eschmann, of Topeka, argued the cause, and *L. M. Ascough,* and *John A. Bausch,* of Topeka, were with him on the brief for the appellees, Farmers Co-op Elevator and Kansas Farmers Union Serum Company.

The opinion of the court was delivered by

O'CONNOR, J.: This is a products liability case that arose from the sale of vaccine for the immunization of cattle against the disease commonly known as Blackleg.

The action was instituted by the purchaser, Ralph S. Chandler

(appellant), against the manufacturer, Anchor Serum Company, the distributor, Kansas Farmers Union Serum Company, and the retailer, Farmers Co-op Elevator (appellees). Subsequent to the filing of the notice of appeal, Ralph Chandler died, and on motion made and allowed, Gladys M. Chandler, executrix of his estate, has been substituted as appellant.

The question presented is whether or not the plaintiff has made out a claim based on (1) *res ipsa loquitur* and (2) breach of an implied warranty.

The salient facts, as gleaned from plaintiff's opening statement and his evidence, are that he had been in the business of raising calves since 1926. As the owner of a large acreage on which he raised approximately 500 calves annually, he had, since about 1928, vaccinated his calves against Blackleg. On only one occasion—in 1958, on a pasture in Chase county—had the disease occurred in his herd. On May 9, 1963, plaintiff purchased several bottles of "CCS Bacterin" from the Farmers Co-op Elevator at Richmond and vaccinated a group of calves, also castrating and dehorning them at the same time. On the two succeeding days he bought additional vaccine from the co-op and vaccinated, castrated and dehorned some more calves. On May 12 four dead calves were discovered among the group vaccinated May 9. A veterinarian who was called diagnosed Blackleg as being the cause of death. The co-op was notified and it in turn called the manufacturer, Anchor Serum Company. A company representative called on the plaintiff, observed the dead animals and the equipment used, and reviewed with plaintiff the method employed. The empty and remaining vials of vaccine were turned over to the representative. During the next several days two more groups of calves were vaccinated. Deaths occurred and lameness developed in both groups. Anchor was notified of the continued trouble. By this time approximately one-half of the herd had been vaccinated with Anchor vaccine. Twenty-nine calves died; others were ill. Several days later approximately 250 more calves were castrated, dehorned and vaccinated with vaccine produced by manufacturers other than Anchor. None of the latter calves developed Blackleg.

All of the calves in the herd were in good physical condition at the time they were vaccinated. The same procedure was followed each time in vaccinating, dehorning and castrating the calves and was performed by the plaintiff and his hired man. Each calf was placed in a "cradle" for handling. The vaccinating and dehorning

equipment was laid on the back of a pickup truck which was backed within five feet of the cradle. The dehorning equipment was placed in disinfectant and was boiled each morning. A syringe was used to administer a 5-cc. dosage of vaccine to each calf. Each bottle of vaccine, when purchased, was sealed with a rubber stopper, and the syringe was filled by piercing the stopper. After each inoculation the syringe was dipped in alcohol and laid on a towel in the back of the truck.

Plaintiff claimed damages for the calves that died, for his time, veterinarian expense in caring for the calves, and depreciation to his pasture land.

In his petition, plaintiff alleged the vaccine was prepared, manufactured and bottled by Anchor, which, in turn, sold it to the distributor and thence to the retailer, and that he suffered damages as a result of Anchor's negligence in the preparation or manufacture of the vaccine, "and other legal causes." Each of the defendants specifically denied liability, and by way of affirmative defense alleged that plaintiff's damages, if any, were contributed to by his own negligence or fault. At a pretrial conference held on October 16, 1964, plaintiff stated that as a basis for recovery he intended to rely on negligence, including *res ipsa loquitur*, and breach of. implied warranty. On May 17, 1965, the case came on for trial. Immediately following plaintiff's opening statement to the jury, the distributor and retailer defendants moved for judgment on the pleadings and opening statement of the plaintiff, and the motion was sustained. The case proceeded to trial against only Anchor, the manufacturer. At the conclusion of plaintiff's evidence Anchor moved for a directed verdict, which motion was sustained. It is from these rulings plaintiff appealed.

In his statement of points plaintiff assigns as error: (1) it was improper for the trial court to sustain the motion for directed verdict in view of evidence sufficient to support a claim in negligence, based upon *res ipsa loquitur*; and (2) the court erred in disregarding the implied warranty that the serum had been manufactured, bottled, handled and sold in such manner as not to be inherently or imminently dangerous.

Farmers Union Serum Company and Farmers Co-op first challenge plaintiff's right to question the trial court's ruling on their motion for judgment on the pleadings and opening statement for several reasons—principally, that plaintiff's statement of points does

not specify the ruling as error. The challenge is meritorious in part. The first point specifically referred to the motion for directed verdict, and in that respect plaintiff has limited himself to a review only of the ruling on the motion for directed verdict in regard to the applicability of the doctrine of *res ipsa loquitur* as against Anchor Serum Company. The second point referred generally to the trial court's disregarding plaintiff's theory of recovery on breach of implied warranty. We believe that under Rule No. 6 (*d*) of our rules of appellate procedure (194 Kan. xiv) the point was sufficiently stated to bring to this court for review the propriety of the trial court's ruling on the motion for judgment on the pleadings and opening statement, as well as its ruling on the motion for directed verdict—all on the implied warranty question as against all defendants.

We now turn to the question of whether or not plaintiff's evidence previously narrated made a submissible case to the jury against the manufacturer of the vaccine under the doctrine of *res ipsa loquitur*. In support of his position, plaintiff argues his evidence established the essential elements as stated in many of our decisions, such as *Mayes v. Kansas City Power & Light Co.*, 121 Kan. 648, 249 Pac. 599, *Nichols v. Nold*, 174 Kan. 613, 258 P. 2d 317, 38 A. L. R. 2d 887, and *Worden v. Union Gas System*, 182 Kan. 686, 324 P. 2d 501, which warrant application of the doctrine. While no contention is made that the doctrine is inapplicable to this particular type of case, Anchor contends that plaintiff did not prove that its serum was the thing or instrumentality which caused plaintiff's injury and damage, and therefore, the doctrine cannot be applied, citing, among other cases, *Emigh v. Andrews*, 164 Kan. 732, 191 P. 2d 901, in particular.

The subject of *res ipsa loquitur* has received generous treatment by this court. Some of the most recent cases in which our numerous decisions are collected and reviewed are *Blue Stem Feed Yards v. Craft*, 191 Kan. 605, 383 P. 2d 540, *Wehkamp v. City of Garden City*, 187 Kan. 310, 356 P. 2d 826, *Worden v. Union Gas System*, supra (majority and dissenting opinions), *Rupe v. Smith*, 181 Kan. 606, 313 P. 2d 293, and *Lamb v. Hartford Accident & Indemnity Co.*, 180 Kan. 157, 300 P. 2d 387. The doctrine is a rule of evidence, rather than substantive law, and does not destroy the force of the rules that negligence is never presumed but must be proved, and that the fact an injury occurs is not sufficient to establish liability.

Ordinarily, the doctrine is applicable only to those cases where the instrumentality or thing causing the injury or damage is under the exclusive control of the defendant at the time of the injury or damage, and the surrounding circumstances are such as to leave no reasonable conclusion to be drawn therefrom other than that the occurrence in question happened because of the negligence of the defendant. Inherent in the doctrine are three essential elements: (1) the thing or instrumentality causing the injury or damage must be within the exclusive control of the defendant; (2) the happening must be of such kind or nature as ordinarily does not occur in the absence of negligence; (3) the happening must not have been due to the fault or contributory negligence of the plaintiff. Once a plaintiff establishes these elements, an inference of negligence arises obligating the defendant to go forward with the evidence to relieve himself of liability.

The doctrine, however, has no application where the thing or instrumentality which caused the injury or damage is unknown or has not been shown. The leading case in which this rule was recognized is *Emigh v. Andrews,* supra, wherein, at page 734, *res ipsa loquitur* was defined as meaning that when the initial fact— namely what *thing or instrumentality* caused the accident—has been shown, then, and not before, an inference arises that the injury or damage occurred by reason of the negligence of the party who had it under his exclusive control. In the *Emigh* case, the petition, instead of alleging the defendant's truck started the fire that destroyed the wheat, alleged facts which raised only a presumption the truck caused the fire. In holding the petition deficient, the court said:

". . . On the mere *presumption* of the initial cause of the fire the further *inference* is sought to be drawn that the truck was defective or improperly operated. Such an inference cannot be drawn from a mere presumption. The established rule is that liability cannot result from an inference upon an inference or from a presumption upon presumption. (Citing cases.) The inference arises only from the established foundation facts. Manifestly the inference cannot supply the foundation facts from which the inference arises." (pp. 735, 736.)

In *Travelers Ins. Co. v. Hulme,* 168 Kan. 483, 213 P. 2d 645, the court observed:

". . . The doctrine has no application to proximate cause—or perhaps we should say no application to the initial fact, or the fundamental or foundation fact which caused the injury or damage. The doctrine will permit an inference or presumption that the known act—or foundation fact—which

produced the injury (proximate cause) was a negligent act, but it will not permit such an inference or presumption as to just what foundation fact did produce the injury—or, in other words, as to what act was the initial cause of the damage. Thus the doctrine cannot be applied where the thing which actually caused the injury or damage is unknown; but when it is known and disclosed and relied upon as the basis of the damage or injury, the application of the doctrine of *res ipsa loquitur* will infer negligence in the doing of the *thing* or in the commission of the *act* (citing cases). . . ." (p. 486.)

The amended petition in that case was held to be sufficient to warrant application of the doctrine because the foundation fact or thing which produced the injury was alleged.

In *Wehkamp v. City of Garden City,* supra, the plaintiff owned an airplane and rented storage space for it in a hanger owned and operated by the city. The airplane was lost in a fire that destroyed the hangar. Plaintiff brought an action against the city and predicated recovery on the doctrine of *res ipsa loquitur.* At the close of plaintiff's evidence, the city's motion for directed verdict was sustained. Many of our cases covering the applicability of the doctrine were analyzed in the course of the opinion, and in concluding that the evidence was insufficient to make out a submissible case to the jury, the court stated:

". . . the most that can be said of the evidence is that it merely establishes that on the night in question—fire of undetermined origin—destroyed the hangar and the airplane which was stored therein. The cause of the fire is left entirely to *conjecture*—which, under the authorities—is insufficient to bring the case under *res ipsa loquitur.*" (p. 316.)

It was therein noted that several of the cases on which the plaintiff relied were distinguishable because the so-called foundation fact was either pleaded or proved—thus bringing each case within the doctrine.

The United States Court of Appeals, in *Franks v. Groendyke Transport,* 229 F. 2d 731 (10th Cir. 1956), resorted to the law of this state in determining that the evidence in that case was insufficient to show actionable negligence under the doctrine. There it was stated:

". . . It is not enough merely to show that the offending agency or instrumentality was under the exclusive management or control of the defendant. It must also be shown that such agency or instrumentality proximately caused the injury. . . .

"The fact that the fire occurred with its resulting destruction of property was not enough to establish liability on the part of the appellee. It was essential that negligence be shown as the proximate cause of the fire. And since the appellants rely upon the doctrine of *res ipsa loquitur,* it was neces-

sary for them to show that the transport was under the exclusive management and oontrol of the appellee; that it caused the fire; and that the fire was such that in the ordinary course of events it would not have happened if the appellee had exercised care commensurate with the circumstances. . . . There was no direct evidence that the fire started in the truck. Appellants rely upon inference or presumption that the transport was the agency or instrumentality which caused the fire. . . ." (pp. 734, 735.)

In light of what has been said, let us examine plaintiff's evidence. As in the case of a demurrer to a·plaintiff's evidence under our former code of civil procedure (G. S. 1949, 60-2909), we are mindful that in reviewing the propriety of an order sustaining a defendant's motion for directed verdict at the close of plaintiff's evidence under K. S. A. 60-250 (a), we are required to consider the evidence, and inferences that may reasonably be drawn therefrom, in the light most favorable to the party against whom the motion is directed. (See cases cited in 5 Hatcher's Kansas Digest, Trial § 151.) Even so, the majority of this court has concluded that plaintiff failed, by his evidence, to establish that Anchor's vaccine caused his calves to contract Blackleg. For that matter, there was no showing that the vaccine contained any live organisms which would cause the disease. At most, the evidence established that the calves died from the disease shortly after being injected with the vaccine; in fact, four calves died on the third day after vaccination. However, the length of time required for an animal to contract the disease after exposure, regardless of how the exposure came about, was not shown; nor does it appear from the evidence at what time an animal became immunized after the vaccine was injected. Whether the vaccine, even if it contained live organisms, was injected for a sufficient length of time to permit the disease to develop, or whether it had been injected for a sufficient length of time to bring about immunization, but was ineffective in that regard, is left unanswered by plaintiff's evidence. The question of what caused the disease in the herd— whether the vaccine, or contaminated dehorning and castrating equipment, whether it was transmitted by other diseased cattle, or picked up from the ground (which can harbor the organism)— is left to conjecture and speculation. Plaintiff, in effect, seeks to rely on all the circumstances and infer from them that the vaccine produced the disease in his cattle, and from this fact thus established, negligence in the manufacturing and preparation of the vaccine may be inferred. As we have pointed out, the inference

of negligence arises only from the foundation fact after it is known and established, but an inference cannot be relied on to establish the foundation fact. Plaintiff's evidence simply failed in this respect, and thus the doctrine of *res ipsa loquitur* was inapplicable.

The judgment of the district court sustaining the motion for judgment on the pleadings and opening statement filed by the defendants, Kansas Farmers Union Serum Company and Farmers Co-op Elevator, and sustaining the motion for directed verdict by the defendant, Anchor Serum Company, is affirmed as to *res ipsa loquitur*.

We now proceed to plaintiff's second point on appeal involving the question of whether or not he is entitled to rely on breach of implied warranty as a basis for recovery against all the defendants —the manufacturer, the distributor and the retailer.

The fact that the question comes to us on diverse rulings affecting the manufacturer on one hand and the distributor and the retailer on the other is of no great moment. The plaintiff's petition and opening statement adequately reveal the commercial journey of the vaccine from the distributor and retailer to the plaintiff.

Although in his statement of points plaintiff refers to an implied warranty that the vaccine had not been manufactured, bottled, handled and sold in such manner as not to be inherently or imminently dangerous, from expressions throughout his brief, we believe he has reference to an implied warranty of fitness—*i. e.*, whether or not under the circumstances there was an implied warranty by the manufacturer, distributor and retailer that the vaccine was fit for the ordinary purpose for which such product is used.

Plaintiff acknowledges that an implied warranty of fitness has never been extended in this jurisdiction to the sale of animal vaccine for immunization of livestock, but argues there is no sound reason why it should be limited to sales of food for human consumption and cosmetic or hair preparations. Conversely, defendants contend there is no implied warranty of fitness in the sale of animal feed, citing our early case of *Lukens v. Freiund,* 27 Kan. 664, and thus an implied warranty should not be imposed in the sale of animal vaccine.

In *Lukens v. Freiund,* supra, the plaintiff sought damages for the death of his cow which had consumed bran purchased from the defendant miller. The cow had swallowed two copper clasps, such as were used in the mill. The plaintiff claimed a right to recover on the ground of an implied warranty of fitness, contending there

was such warranty, whether food be purchased for personal use or for the feeding of livestock. In rejecting the claim, the court held that while there may be an implied warranty that food sold by a dealer to a consumer for immediate domestic consumption is sound and wholesome, such warranty exists only when the food is purchased for human consumption, and does not exist where bought and used for the feeding of stock alone. The rationale for the court's conclusion may be found in the following language of the opinion:

". . . for reasons of public policy, for the preservation of life and health, the law deems it wise that he who engages in the business of selling provisions for domestic use should himself examine and know their fitness for such use, and be liable for a lack of such knowledge. . . .

"If the preservation of human life and health be, as we think it is, the foundation of this exception, then it should not be extended to cases in which human life and health are in no wise endangered. Now the claim of the plaintiff is simply of a property loss, that his estate has been diminished, and that alone is his cause of action. His injury is similar to that which he would have sustained if he had purchased from a wagon maker a defective wheel, and thereby his wagon had broken down. No matter of life or health of himself or family is involved. . . ." (pp. 669, 670.)

Where personal injury or death is caused by unwholesome or contaminated food or drink, we have consistently held that liability may be imposed on the basis of an implied warranty that the food is fit for human consumption. (*Parks v. Pie Co.*, 93 Kan. 334, 144 Pac. 202; *Challis v. Hartloff*, 136 Kan. 823, 18 P. 2d 199; *Stanfield v. F. W. Woolworth Co.*, 143 Kan. 117, 53 P. 2d 878; *Swengel v. F. & E. Wholesale Grocery Co.*, 147 Kan. 555, 77 P. 2d 930; *Sharp v. Pittsburg Coca Cola Bottling Co.*, 180 Kan. 845, 308 P. 2d 150; *Simmons v. Wichita Coca-Cola Bottling Co.*, 181 Kan. 35, 309 P. 2d 633; *Cernes v. Pittsburg Coca Cola Bottling Co.*, 183 Kan. 758, 332 P. 2d 258; *Rupp v. Norton Coca-Cola Bottling Co.*, 187 Kan. 390, 357 P. 2d 802; *Connell v. Norton Coca-Cola Bottling Co.*, 187 Kan. 393, 357 P. 2d 804.) Likewise, an implied warranty has been extended to include beverage containers (*Nichols v. Nold*, 174 Kan. 613, 258 P. 2d 317, 38 A. L. R. 2d 887) as well as hair preparations (*Graham v. Bottenfield's, Inc.*, 176 Kan. 68, 269 P. 2d 413; *Patterson v. Weyer, Inc.*, 189 Kan. 501, 370 P. 2d 116).

An implied warranty does not arise from any agreement, as such, between the parties, but is imposed by operation of law on the basis of public policy for the protection of the people. (*Connell v. Norton Coca-Cola Bottling Co.*, supra; *Cernes v. Pittsburg Coca*

*Cola Bottling Co.,* supra; *Graham v. Bottenfield's, Inc.,* supra.) Thus, privity of contract is not essential to recovery against the manufacturer and each intermediate dealer, as well as the retailer. (*Rupp v. Norton Coco-Cola Bottling Co.,* supra, and cases therein cited.) The rule is well stated in *Swengel v. F. & E. Wholesale Grocery Co.,* supra, as follows:

"Where articles of food for human consumption are manufactured or packed by a manufacturer or packer, and by a series of transactions reach a retail dealer who sells to the consumer, the manufacturer or packer, each intermediate dealer and the retail seller impliedly warrant that such articles of food are wholesome and fit for immediate human consumption." (Syl. ¶ 2.)

In *B. F. Goodrich Company v. Hammond,* 269 F. 2d 501 (10th Cir. 1959), a husband and wife were killed in an automobile accident resulting from the blowout of a tire purchased by the husband from the defendant company. Applying Kansas law, the court found there was an implied warranty of fitness of an automobile tire for the purpose for which it was designed, *i. e.,* as a tire protected against sudden blowouts, citing *Rig & Reel Co. v. Oil & Gas Co.,* 111 Kan. 37, 205 Pac. 1020, and held that since implied warranty in this state was imposed by operation of law, privity was not essential, and the warranty ran to the wife of the purchaser of the tire. The case was cited with approval in *Rupp v. Norton Coca-Cola Bottling Co.,* supra, which held an implied warranty imposed by law extended to the sister of the purchaser, notwithstanding the lack of privity of contract. We have likewise held that in an action to recover on a breach of implied warranty, neither the contributory negligence of the user nor evidence negativing the lack of due care on the part of the manufacturer, distributor or retailer constitutes a defense. (*Challis v. Hartloff,* supra; *Simmons v. Wichita Coca-Cola Bottling Co.,* supra.)

Courts in other jurisdictions in which recovery has been sought against the manufacturer and seller of animal foods and medicines for breach of an implied warranty of fitness vary widely in their holdings and reasonings (see Anno. 81 A. L. R. 2d 138, §§ 11, 12; 3 Hursh, American Law of Products Liability, ch. xxi). We note, however, that there has been a continuous eroding of the doctrine of *caveat emptor* in the area under consideration. We will mention only a few of the many cases that have come to our attention.

In our neighboring state of Missouri an implied warranty of fitness attaches to the sale of food for animals where the food is not in its raw state but has been processed and packaged by the

manufacturer. (*Midwest Game Company v. M. F. A. Milling Company*, 320 S. W. 2d 547 (Mo. 1959) [fish food]; *Albers Milling Company v. Carney*, 341 S. W. 2d 117 (Mo. 1960) [turkey feed].) Also see, *Borman v. O'Donley*, 364 S. W. 2d 31 (Mo. App. 1962) which held that corn silage was a processed animal food and there was an implied warranty of fitness and wholesomeness on the part of the seller, citing numerous cases from other states holding that a seller of feed for consumption by animals is bound by an implied warranty that the product is fit for the intended purpose.

In *Burrus Feed Mills, Inc. v. Reeder*, 391 S. W. 2d 121 (Tex. Civ. App. 1965) the court, in a well-reasoned opinion, extended an implied warranty to feed manufactured and processed for consumption by animals and advertised or labeled for such purpose, and held that the manufacturer as well as the retailer was liable to the ultimate purchaser, notwithstanding the absence of privity between the manufacturer and the purchaser. The court cited *McAfee v. Cargill, Inc.*, 121 F. Supp. 5, which, applying California law, had reached a similar conclusion, saying:

". . . The same public policy considerations present for the protection of humans in the use of packaged and processed foods are also present where instead we deal with animals. . . ." (p. 6.)

Our research of decisions involving the manufacture and sale of drugs and medicines for treatment of animals has disclosed a dearth of cases dealing directly with an implied warranty of fitness. Cases in which recovery has been permitted against the manufacturer and seller have been under an express warranty in some instances and on negligence in others. (Annos. 81 A. L. R. 2d 138, §§ 27, 28, and 39 A. L. R. 399.) .

In *Brown v. Globe Laboratories, Inc.*, 165 Neb. 138, 84 N. W. 2d 151, the plaintiff purchased "Clostridium Perfringens Type D Bacterin," a product designed for the prevention of Enterotoxemia in sheep, from a veterinarian who had, in turn, obtained it from the manufacturer. The manufacturer was held liable on both implied and express warranties regarding the fitness and quality of the bacterin.

In *Marxen v. Meredith*, 246 Iowa 1173, 69 N. W. 2d 399, the plaintiff sued for injury and death to his pigs from treatment with a hog spray purchased from the defendant retailer. Recovery was permitted on both express and implied warranty theories, the latter being an implied warranty of fitness for a particular purpose.

The foregoing cases amply illustrate a progressive step taken by many courts away from the harsh doctrine of *caveat emptor* in the field of animal feeds and medicines. The trend is further hastened by the adoption of the new Uniform Commercial Code in many states, including our own as of January 1, 1966. While this case arose before the code became effective, we note the provision therein that a warranty of merchantability is implied in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind. As a part of the implied warranty of merchantability is the requirement that the goods be at least "fit for the ordinary purposes for which such goods are used" (K. S. A. 84-2-314).

In view of what has been said, we believe our holding in *Lukens v. Freiund*, supra, no longer represents the public policy of this state in regard to products intended for the feeding and caring of domestic animals. Indeed, the same public policy consideration necessary for the protection of human beings involving the manufacture and sale of food and drink for human consumption is likewise present in cases dealing with animal foods and medicines. Domestic animals constitute the backbone of farm economy in many of the agricultural areas of this country. In our system of enterprise where the potential purchaser is subjected to the advertising pressures of manufacturers, distributors and retailers in promoting the sale of a product, it is of necessity that the purchaser be provided a measure of assurance that the product is fit for the ordinary purposes for which it is sold. Medicines and vaccines for the treatment of domestic animals are manufactured and sold for the purpose and with the expectation they will be used as such, and public policy dictates that if such articles are unfit for the use contemplated by all parties in the chain of sale, then the purchaser must be protected. Accordingly, we are of the opinion there is no compelling reason in our modern-day system of merchandising to refuse to extend an implied warranty of fitness to include animal vaccines.

Further, we hold that the implied warranty of fitness runs not only from the manufacturer who created the defective product, but also from the distributor-wholesaler and the retailer as well. Against this position the distributor and retailer here cite a line of Kansas cases, including *Ehrsam v. Brown*, 76 Kan. 206, 91 Pac. 179, *Parker v. Hutchinson Motor Car Co.*, 127 Kan. 765, 274 Pac. 1115, *Oil Well Supply Co. v. Hopper*, 129 Kan. 300, 282 Pac. 701,

to the effect there is no implied warranty by a dealer against latent defects that could not have been discovered by ordinary inspection or of which he had no knowledge. However, we believe a more enlightened view has been expressed in many of our recent cases, such as *Patterson v. Weyer, Inc.,* supra, *Graham v. Bottenfield's, Inc.,* supra, and *Swengel v. F. & E. Wholesale Grocery Co.,* supra. Again, as a matter of public policy, the purchaser is entitled to protection, and there is no logical reason in this day and age that he should be accorded recourse against less than all the parties forming the conduit whereby a defective product reaches his hands. Certainly a retailer is the one who directly presents the product to the public, often with the full force of his own advertising campaign. The wholesaler, also, is an indispensable link in the chain, and, as stated in *Swengel v. F. & E. Wholesale Grocery Co.,* supra:

". . . it seems illogical to hold that the injured consumer might maintain an action against the immediate seller or the manufacturer or packer, but not against the intermediate purchasers and sellers of the articles of food. To so hold would mean that if the immediate seller were financially irresponsible, and the packer, for instance, were located in a foreign country, the injured consumer would, from a practical standpoint, be without remedy. . . ." (p. 561.)

No question is raised by the defendants here concerning the sufficiency of plaintiff's evidence that there had, in fact, been a breach of an implied warranty, and the matter need not be discussed. (Anno. 81 A. L. R. 2d 138, § 17.)

The judgment of the district court sustaining the motion for judgment on the pleadings and opening statement filed by the defendants, Kansas Farmers Union Serum Company and Farmers Co-op Elevator, sustaining the motion for directed verdict by the defendant, Anchor Serum Company, is reversed as to implied warranty.

Accordingly, the plaintiff is entitled to present his claim for breach of an implied warranty against all the defendants, and the district court is directed to grant a new trial in accordance with the views herein expressed.

FATZER, J., concurring in part and dissenting in part: I dissent from that part of Syllabus ¶ 5 and the corresponding portion of the opinion holding that the plaintiff's evidence was insufficient to make a submissible case to the jury against Anchor Serum Company

under the doctrine of *res ipsa loquitur*.  I concur in that part of Syllabus ¶ 5 and the corresponding portion of the opinion holding the plaintiff is entitled to present his claim for breach of an implied warranty against the multiple defendants.

FROMME, J., joins in the foregoing concurring and dissenting opinion.